Arthur M. ROSS, an individual and Grace B. Ross, an individual, Plaintiffs,

v.

CITY OF BERKELEY, a municipal corporation, et al., Defendants.

No. C–85–7321 MHP.

United States District Court, N.D. California.

Feb. 25, 1987.

As Amended June 11, 1987.

of the Bank's interest.

David A. Self, Douglas Y. Dang, Self & Dang, Oakland, Cal., for plaintiffs.

Seymour Farber, Richard E. Blumberg, James R. Grow, Madway Blumberg Bishop & Smith, Berkeley, Cal., for defendants.

## OPINION

PATEL, District Judge.

Plaintiffs, owner and lessors of commercial rental property, bring this action against the City of Berkeley ("the City") and their current lessees ("the lessees") on the basis, *inter alia*, of the alleged unconstitutionality of the City's Telegraph Avenue Area Commercial Rent Mediation and Arbitration Ordinance and its preceding temporary enactments. Plaintiffs claim that the ordinance unconstitutionally deprives them of possession of their premises in violation of rights secured under the Contracts Clause, the Due Process Clause, and the Takings Clause of the United States Constitution, all in violation of the

Federal Civil Rights Act of 1871, 42 U.S.C. § 1983. The gravamen of plaintiffs' complaint is that the ordinance, by failing to acknowledge as good cause for lease nonrenewal an owner's desire to personally occupy his or her commercial property, unconstitutionally upsets the contractual agreement reached between lessor and lessee while depriving the owner of property without due process of law or just compensation.

The matter is currently before the court on plaintiffs' motion for summary judgment on these constitutional claims. For the reasons set forth below, plaintiffs' motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

### A. *Statutory History*

Only three cities in the United States have ever enacted commercial rent control ordinances: Albany, New York, for a brief period during 1948, New York City from 1945 to 1963, and Berkeley itself on three separate occasions beginning in 1978. Keating, *The Elmwood Experiment: The Use of Commercial Rent Stablization to Preserve a Diverse Neighborhood Shopping District*, 28 Wash.U.J.Urb. & Contemp.L. 107, 124–38 (1985).[1] Berkeley's regulation of commercial rental practices began in 1978 with a ballot initiative establishing City-wide commerical rent control for one year. The initiative was followed in 1982 with an ordinance regulating commercial rental practices in the Elmwood district of the City, and in 1985 with an ordinance establishing similar controls for the Telegraph Avenue district.

The first of these regulations, a ballot initiative passed in November 1978 entitled "Renter Property Tax Relief," required a

partial rebate to residential and commercial renters of the property tax reductions received by the City's landlords as a result of the passage of Proposition 13. *Id.* at 136; Berkeley, Cal., Mun. Code ch. 7, § 44. Eighty percent of each landlord's tax savings were to be credited to renters in the form of rent reductions, and rent increases were controlled in an attempt to bar landlords from offsetting the costs of the rebate. Keating, *supra* at 137. The initiative created no enforcement mechanism and expired by its own terms on December 31, 1979. *Id.* While the provisions controlling residential rents were extended after the initiative's expiration date, those controlling commercial rents were not. *Id.*

Berkeley's next attempt to regulate commercial rental practices began in 1982 with the passage of an initiative establishing the Elmwood Commercial Rent Stablization and Eviction Protection Program, which presently governs commercial rents and evictions in the City's Elmwood district. Berkeley, Cal., Mun. Code ch. 13, § 80. As Keating observes, "[s]everal significant differences exist between the [the 1978–79 rent control initiative] and [the Elmwood ordinance]. First and foremost, [the temporary initiative] was not so much of a commercial rent control scheme as it was a limited form of property tax relief; its purpose was not to prevent the displacement of merchants." Keating, *supra* at 137. Conversely, the Elmwood ordinance couples rent control with strict regulation of commercial eviction practices in an attempt to secure existing commercial tenants from displacement.[2] Accordingly, landlords may evict commercial tenants or refuse to renew existing leases for only eight strictly enumerated reasons. Berkeley, Cal., Mun. Code ch. 13, § 80.090.[3] An owner's desire

---

**1.** Puerto Rico also enacted commercial rent and eviction controls in 1946. *See Rivera v. R. Cobian Chinea & Co.*, 181 F.2d 974 (1st Cir.1950).

**2.** The stated purposes of the Elmwood ordinance "are to protect commercial tenants in the Elmwood district from rent increases which are not justified by landlord's cost increases; to enable those tenants to continue serving residents of the Elmwood district without undue price increases, expansion of trade (which may exacerbate parking problems), or going out of

business; and to test the viability of commercial rent stabilization as a means of preserving businesses which serve the needs of local residents in Berkeley neighborhoods, outside the downtown district." Berkeley, Cal., Mun.Code, ch. 13 § 80.020.

**3.** Good cause for eviction under the ordinance includes: (1) failure to pay rent; (2) substantial violation of the terms of the lease "(other than an obligation to surrender possession at the end of a term or upon notice);" (3) committing a

to recover personal possession for commercial use is not among the authorized grounds for eviction or lease nonrenewal. *Id.*

The process leading to the enactment of the third of the City's commercial rent control ordinances began on December 11, 1984, when the mayor brought before the City Council an "Emergency Action Item" outlining a number of recent changes in the character of the Telegraph Avenue business district which the mayor believed might warrant an extension of the Elmwood ordinance to the Telegraph business district. Defendants' Exhibit 2. The mayor enumerated the following developments in the Telegraph commercial district as the basis for his concern:

> Numerous businesses face a situation in which sharply increased lease costs threaten their ability to continue to serve the community. Several have already ceased to exist. Further, there has been a pattern developing in which a fairly broad range of retail uses in this district is being replaced with a much more narrow range of uses, principally food-related. Similarly, locally owned businesses seem to face displacement by chains, franchises and other forms of non-Berkeley ownership. The market rate for commercial space on Telegraph appears to be rising suddenly from one dollar or less per square foot to approximately three dollars per square foot. *Id.*

With the City Council's authorization, the mayor subsequently appointed an ad hoc committee to investigate the various policy options available to the City to regulate rental practices in the Telegraph Avenue district. The mayor indicated that possible courses of action "could range from the development of an area plan to development of a commercial rent stabilization measure for this area." *Id.*

On February 15, 1985, the ad hoc committee submitted its report to the City Council. While the committee was unable to reach any conclusion regarding the imposition of commercial rent control in the district, there was agreement that interim measures should be enacted while the City developed a comprehensive area plan to "preserve and enhance the character of the neighborhood." Defendants' Exhibit 3. The committee proposed that these interim provisions include "a six month moritorium on use changes, evictions, and rent increases above the [Consumer Price Index]." *Id.* The committee explicitly declined to characterize the interim recommendations as the initiation of rent control; they stated in their report to the City Council that the "recommendations are intended as part of an area planning process and not necessarily a rent control process." *Id.*

On February 26, 1985, the City Council enacted Ordinance 5640–N.S., which implemented the interim recommendations of the ad hoc committee for a period of 90 days. The stated purpose of the ordinance was

> to preserve the unique character of the commercial district in the neighborhood of Telegraph Avenue by regulating new and changed retail and commercial uses in this district pending the adoption of an Area Plan pursuant to the Neighborhood Commercial Preservation Ordinance ('NCPO') and by imposing eviction controls and rent limitations pending completion of a study of the recent pattern of rent increases and evictions in the district to ascertain the need for a longer term approach to the problems identified.

Berkeley, Cal., Ordinance 5460–N.S. § 2 (February 26, 1985). Section 6 of Ordinance 5460–N.S. enacted eviction regulations identical to those contained in the Elmwood ordinance, thus limiting eviction and lease nonrenewal to eight specified grounds and excluding owner occupancy as just cause for recovery of possession.[4] *Id.*

nuisance on the premises; (4) using the premises for an illegal purpose; (5) refusal to execute an extension or renewal of a lease upon expiration of a prior rental agreement; (6) refusal to allow a landlord access to make necessary repairs; (7) a landlord's desire to recover possession to remove the premises from commercial

use; and (8) a landlord's desire to recover possession to make repairs that cannot be completed while the tenant occupies the premises. Berkeley, Cal., Mun.Code ch. 13, § 80.090.

4. *See* note 3, *supra.*

The City Council subsequently extended the temporary ordinance until February 28, 1986, to allow the City's Planning Commission additional time to develop a permanent policy approach to the issues of "rents, evictions and commercial uses in the Telegraph Avenue area." Defendants' Exhibit 8; Berkeley, Cal., Ordinance 5657–N.S. (May 21, 1985); Berkeley, Cal., Ordinance 5688–N.S. (October 1, 1985).

On March 20, 1985, the Planning Commission established a subcommittee responsible for the development and evaluation of policy alternatives for the Telegraph Avenue business district. On December 4, 1985, the subcommittee presented to the Planning Commission a proposed ordinance establishing commercial rent and eviction controls which, *inter alia*, did not recognize owner-occupancy as a good cause for recovery of possession. The subcommittee indicated in its report to the Commission that the exclusion of owner occupancy from the enumeration of good causes was "due to uncertainty as to the potential for abuse of the provision (e.g., landlords not really intending to occupy the property.)" Defendants' Exhibit 8, at 4. The subcommittee, however, "was sympathetic to the owner's inability to reclaim a unit, and 'flagged' this as a problem for which strict guidelines might be provided." *Id.* at 5.

On December 18, 1985, the Planning Commission approved a modified version of the subcommittee's proposed ordinance and submitted it to the City Council for final action. The exclusion of owner occupancy from the enumeration of good causes for eviction generated substantial controversy among the commissioners, and they ultimately failed to agree on any recommendation to the City Council with respect to the issue. Defendants' Exhibit 9, at 5. Their report to the Council, though, included an extensive discussion of the various commissioners' views on the subject. Commissioners expressed widely differing opinions about the legality and fairness of the provision. In defense of the provision, one commissioner stated that commercial rent control "is a new area, there are a lot of issues which will have to be addressed as time goes by; ... but we shouldn't allow those problems to 'shoot down' what has been a fairly productive series of conversations." *Id.*

On January 14, 1986, the city manager of Berkeley submitted a separate report to the City Council on the Planning Commission's proposed rent and eviction control ordinance. The city manager prepared the report because "City staff have some disagreements with some of the implementing elements of the ordinance, and because the Planning Commission was not able to send a recommendation on the issue of owner-occupancy evictions...." Defendants' Exhibit 10, at 1. The city manager argued that the inclusion of owner occupancy as a good cause for eviction could "provide a loophole that would undo the operation of the law."

> In the commercial context, occupancy by the owner may be a paper arrangement. For example, tenant A may be renting a space for $1.00/sq. ft. Potential tenant B may be willing to pay $2.50/sq. ft. The landlord and tenant B can write an agreement which gives potential tenant B a 51% ownership interest in the commercial space and therfore gives potential tenant B the right to evict tenant A. In fact, the 51% ownership interest of potential tenant B may be heavily mortgaged to the landlord.... Furthermore, eviction for owner occupancy in the commercial context offers the advantage that the unit can subsequently be rerented at unregulated rent levels, since the ordinance, unlike the residential rent regulations, does not place a ceiling on rent levels that are voluntarily agreed to by the parties.

*Id.* at 8–9. The report indicated that the staff had considered alternatives to the prohibition of owner occupancy evictions, such as compensation for evicted businesses and penalities for bad faith evictions, but had concluded that "such schemes would not resolve the issues raised by allowing this type of eviction...." *Id.* at 9. The report did not indicate why such alternatives were deemed inadequate.

On January 21, 1986, the City Council enacted a permanent rent and eviction con-

trol ordinance for the Telegraph Avenue commercial district, effective March 1, 1986. The stated purpose of the permanent ordinance "is to preserve the unique character of the Telegraph Avenue Area commercial district and to prevent displacement of businesses by excessive rent increases and/or evictions." Berkeley, Cal., Ordinance 5708–N.S. § 2 (January 21, 1986). Section 9 of 5708–N.S. specifies the limited grounds allowed for eviction or lease nonrenewal, and essentially incorporates the applicable provisions of the Elmwood ordinance.[5] The permanent ordinance thus reflects the recommendation of the city manager to exclude owner occupancy as good cause for recovery of possession.[6]

The Telegraph Avenue ordinance couples eviction controls with an arbitration procedure to determine commercial rents. Certain rent increases, including those not exceeding the Consumer Price Index and those established by written agreement of the parties, are not subject to the arbitration process. All others must be submitted to an arbitrator upon petition of either the tenant or landlord, to be evaluated on the basis of eighteen enumerated criteria. Ordinance 5708–N.S. §§ 6, 7, 11. The ordinance dictates that "particular weight shall be given to the first criterion," which requires consideration of "[t]he extent to which a business contributes to the uniqueness and diversity of the Telegraph Avenue Area and to the availability of goods and services in the Telegraph Avenue Area and the city." *Id.* at § 7. Either party may appeal the arbitrator's ruling within sixty days to the Superior Court. *Id.* at § 11(d)(iii).

### B. *The Property and the Lease*

In 1979 plaintiff Arthur Ross and three others joined in a partnership known as Bancroft Properties. The partnership subsequently purchased two lots on the southwest corner of Bancroft and College Avenues in the City of Berkeley, which contained a parking lot, a cafe, and the Berkeley Women's Club. The partnership informed the tenant of the cafe that the rent would be increased, upon expiration in 1980 of the lease then in effect, from $1500.00 to $3000.00 per month. The tenant indicated that he was hestitant to renew under the new terms.

Defendant lessees David Boyd and Patricia Weigt subsequently approached the partnership and inquired about renting the premises. Boyd and Weigt planned to form a corporation to operate a cafe and offered stock to the members of the partnership. In May 1980 plaintiff Ross—who was in the process of buying out the partnership and assuming sole ownership of the property—offered a five-year lease for the cafe to Boyd and Weigt. The lease was signed by Boyd, Weigt, and by two of Ross's former partners in Bancroft Properties, Philip Swinford and Lawrence Lee, who had assumed an interest in the new venture. Defendant lessees signed the lease individually and as "aka Espresso Roma, Inc.," even though Espresso Roma was not formed until the following month.[7] The lease did not contain any provision for extension or renewal absent express agreement of the parties. From 1980 to 1985, defendant lessees established a successful espresso cafe on the premises, increasing the daily revenue from $700.00 to $4400.00 over the period of the tenancy.

---

**5.** The primary distinction between the provisions of the Elmwood and Telegraph ordinances is the omission from 5708–N.S. of an owner's right to evict to recover possession for the purpose of removing the rental unit from commercial use. *Compare* Berkeley, Cal., Mun.Code ch. 13, § 80.090(G) and Ordinance 5708–N.S. § 9.

**6.** Section 9 of 5708–N.S. specifies the following grounds for eviction: (1) failure to pay rent; (2) substantial lease violation; (3) committing a nuisance on the premises; (4) using the premises for an illegal purpose; (5) refusal to renew or

extend an expired lease; and (6) refusal to provide the landlord access to make repairs, improvements, or to show the premises to prospective buyers or tenants.

**7.** When the corporation was formed in June 1980, plaintiff Ross received eight shares while the remaining shareholders each received twenty-three shares. The corporation ultimately bought back plaintiff's shares for $60,000.00 in October 1982.

On December 31, 1984, plaintiffs Arthur M. Ross and Grace B. Ross notified defendant lessees that the lease for the premises would not be renewed upon its expiration at the end of June, 1985. Plaintiffs repeated the notification in May 1985. Upon expiration of the lease defendant lessees did not vacate the premises. Plaintiffs have since been barred from regaining possession by the provisions of Ordinance 5640–N.S. § 6 and Ordinance 5708–N.S. § 9. Since the expiration of the lease, defendant lessees have paid an increased rent reflecting changes in the Consumer Price Index, and have offered to pay a substantially increased amount in return for a four-year lease with a promise to vacate at the end of the term. Plaintiffs have not accepted defendant lessees' offer, nor have they invoked the rent arbitration process provided by Ordinance 5708–N.S. to negotiate a higher level of compensation.

## II. DISCUSSION

Plaintiffs contend that the exclusion of owner occupancy from the enumeration of good causes for eviction or lease nonrenewal in Ordinance 5640–N.S. and Ordinance 5708–N.S., by nullifying plaintiffs' right to recover possession of their commercial property, facially deprives them of rights secured under the Contracts Clause, the Takings Clause, and the Due Process Clause of the United States Constitution. Plaintiffs now move for summary judgment on these claims. Summary judgment is appropriate when there remains no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Radobenko v. Automated Equipment Corporation*, 520 F.2d 540, 543 (9th Cir.1975).

### A. *The Contracts Clause*

Article I, Section 10, Clause 1 of the United States Constitution provides that "[n]o State shall … pass any … Law impairing the Obligation of Contracts…." While absolute in nature, it has long been accepted that the language of the Clause does not act as a complete bar to legislative alterations of existing contractual obligations: "its prohibition must be accommo-

dated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983), quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413 (1934).

In a series of recent opinions, the Supreme Court has delineated the reach of the Clause and set forth a three-part inquiry to guide in its interpretation. Parties seeking relief must demonstrate (1) that there has been a substantial impairment of a contractual relationship; (2) that the impairment is not justified by a "significant and legitimate public purpose;" or if so justified, then (3) that the impairment is not based upon reasonable conditions or "'… of a character appropriate to the public purpose justifying [the legislation's] adoption.'" 459 U.S. at 411–12, 103 S.Ct. at 705; quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92, *reh'g denied*, 431 U.S. 975, 97 S.Ct. 2942, 53 L.Ed.2d 1073 (1977). Absent such a showing, a regulation interfering with contractual obligations will withstand scrutiny under the Contracts Clause.

1. *Substantial Impairment.* Plaintiffs first must demonstrate that Ordinance 5640–N.S. and Ordinance 5708–N.S. have impaired substantially the contractual agreement that they reached with defendant lessees. While complete destruction of the rights of a contracting party is not required to find an impermissible impairment, the degree of contractual interference is critically significant to the constitutional analysis. 431 U.S. at 27, 97 S.Ct. at 1520. "Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry into a careful examination of the nature and purpose of the state legislation." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727, *reh'g denied*, 439 U.S. 886, 99 S.Ct. 233, 58 L.Ed.2d 201 (1978); *El Paso v. Simmons*,

379 U.S. 497, 516–517, 85 S.Ct. 577, 587–88, 13 L.Ed.2d 446, *reh'g denied,* 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 813 (1965).

The Court has suggested a variety of factors which bear on the determination of an impairment's substantiality. Significant among these is whether the state has restricted plaintiffs "to gains [they] reasonably expected from the contract." 459 U.S. at 411, 103 S.Ct. at 704. Also significant is the extent to which the industry entered into by the contracting parties was supervised by the state at the time of the agreement. 459 U.S. at 411, 103 S.Ct. at 704; 438 U.S. at 242, n. 13, 98 S.Ct. at 2721, n. 13; *Veix v. Sixth Ward Bldg. & Loan Ass'n,* 310 U.S. 32, 38, 60 S.Ct. 792, 794–95, 84 L.Ed. 1061 (1940). As Justice Holmes stated, "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 531–32, 52 L.Ed. 828 (1908).

■ Considering the reasonable expectations of the contracting parties in the instant case and the extent of state supervision of the commercial leasing industry at the time of the agreement, it is evident that the contract between plaintiffs and defendant lessees has been impaired substantially by Ordinance 5640–N.S. and Ordinance 5708–N.S. The lease in question unambiguously stipulates a five-year term. At the expiration of the lease, the lessee is obliged by the explicit terms of the contract to surrender possession absent agreement of the lessor to a holdover month-to-month tenancy. Lease ¶¶ 5, 22. It can hardly be suggested that the nullification of this term by the operation of the ordinance comports with the reasonable expectations of the parties.[8] The fixed period for which a lessor agrees to surrender possession is among the most essential bargained-for components of a rental agreement, bearing directly on the determination of appropriate consideration. By supplanting the lease's fixed five-year term with a potentially endless tenancy,[9] the ordinance un-

---

**8.** While defendants argue at length over the question of whether plaintiffs, at the time of entering into the lease, actually intended to recover possession at its termination, the issue is irrelevant to the determination of the parties' reasonable expectations under the agreement. First, under the parol evidence rule, the court cannot look past the unambiguous terms of the writing to interpret the intention of the contracting parties. Second, defendants have offered no evidence that at the time of contracting, plaintiffs did not intend to preserve their right to determine at the time of termination whether to recover possession or alternatively renew the tenancy. This, and not whether plaintiffs initially contracted with the specific intent to personally recover possession at the termination of the lease, is the factual question bearing on the legitimate expectations of the parties. There is no genuine dispute with regard to it.

**9.** There is some dispute as to the potential duration of defendant lessees' tenancy under Ordinance 5708–N.S. It is clear from the terms of the ordinance that the lessee can renew a lease endlessly, so long as the lessee does not violate the enumerated causes for eviction provided under Section 9. Ordinance 5708–N.S. § 9(e). Presuming that all lessees to the instant contract were individuals, the leasehold thus would extend for the longest of their lives. Defendant lessees Boyd and Weigt are under thirty years of age, so their leasehold reasonably could be ex-

pected to survive for forty to fifty years. Alternatively, were any of the lessees a corporation, the leasehold potentially would be endless under California law, where a corporation "continues perpetually." Cal.Corp.Code § 200(c) (West Supp.1987). Defendant individual lessees signed the lease in question as "aka Espresso Roma, Inc.," one month prior to the formation of the corporation. Defendants accordingly contend that while the corporation's name is on the lease, the corporation itself was not a party to the contract and thus cannot assert an interest in the tenancy. Defendants argue that the leasehold extension created by the ordinance therefore is not permanent but rather limited to the lives of the individual lessees, and suggest that the distinction bears critically on the severity of the contract impairment as well as on the question of whether a taking has occurred.

The court first must note that in this case it fails to appreciate the gravity of the distinction between a permanent denial of possession and a denial lasting fifty years. Either effectively bars the plaintiffs from occupying the premises for the remainder of their lives. Second, and more significantly, the distinction is irrelevant to this action. Contrary to the defendants' contention, Espresso Roma can establish its status as a party to the lease under the doctrine of corporation by estoppel. As Witkin observes, "[i]f an individual contracts with an association as if it were a corporation, he cannot escape liability on his contract by denying its corporate exist-

questionably upsets, in a severe and substantial manner, the bargain struck between plaintiffs and defendant lessees.

■ Neither did the positive law encompassing the contract at the time of its execution provide sufficient notice of the City's supervisory intent to suggest to the parties the possibility of further regulation of this character. The Supreme Court noted in *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. at 38, 60 S.Ct. at 795, that "[w]hen [a party] purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic." The history of commercial rent and eviction control in the United States, and specifically in the City of Berkeley, indicates that the enterprise of commercial leasing has not been sufficiently regulated in the particular to which plaintiffs object to establish that they contracted "subject to further legislation upon the same topic."

Only three cities in the United States have ever instituted commercial rent control ordinances. The first two, Albany and New York, did so as emergency measures at the close of the Second World War, and terminated the controls in 1948 and 1963 respectively. The City of Berkeley was the next to attempt such regulation. Its first attempt preceded the parties' contract in the instant action, but critically lacked the essential elements of the ordinance now in dispute to have sufficiently put the parties on notice of the City's subsequent regulatory intent. Berkeley's 1978 "Renter Property Tax Relief" initiative "was not so much of a commercial rent control scheme as it was a limited form of property tax relief; its purpose was not to prevent the displacement of merchants." Keating, *supra* at 137. It imposed no controls on commercial evictions, established no admin-

istrative procedure to arbitrate rent increases, and placed no limitations on an owner's right to personally recover possession. The measure simply provided for a temporary percentage rebate of commercial landlords' tax savings resulting from the passage of Proposition 13, and expired without extension on December 31, 1979.

The City first instituted commercial rent and eviction controls of the nature here challenged in 1982, well after the parties formed the contract in question. The City's 1982 Elmwood ordinance explicitly acknowledges the experimental nature of the new regulatory scheme: among the ordinance's stated purposes is "to test the viability of commercial rent stabilization as a means of preserving neighborhoods, outside the downtown district." Berkeley, Cal., Mun. Code ch. 13, § 80.020. With the passage of the Elmwood ordinance, the City for the first time enacted eviction controls for commercial tenancies, established a formal administrative process to determine allowable rents, and imposed controls in one particular business district rather than on a City-wide basis. The deliberations in 1985 during the drafting of the Telegraph Avenue ordinance reflect a similar appreciation of the novelty of the City's regulatory efforts. As one planning commissioner stated in support of the proposed ordinance, commercial rent control "is a new area, there are a lot of issues which will have to be addressed as time goes by...." Commissioners also discussed at length their uncertainty about the legality of the owner occupancy exclusion, indicating quite clearly their understanding that the provision tested relatively uncharted regulatory waters.

In light of the significant differences between the provisions of the 1978 and 1985–86 ordinances, and the frank acknowledge-

ence." 6 B. Witkin, *Summary of California Law,* Corporations § 17 (1974); *see, e.g., Home Owners' Loan Corp. v. Gordon,* 36 Cal.App.2d 189, 192, 97 P.2d 845 (1939) ("[A]ppellants, ... having contracted with the respondent as a corporation and received benefits of that contract, are now estopped to deny as against the corporation, in an action to enforce such a contract, that it has been legally organized or to assert in any manner any defect or irregularity in such

organization. This rule is established by a long line of authorities....") Since plaintiff Ross contracted with the corporation, by name, when he executed the lease, it is likely he would be estopped from challenging Espresso Roma's interest in the lease on the basis of its nonexistence at the time of execution. The corporation therefore could insist on full performance, including perpetual lease renewal, as a protected tenant under the terms of the ordinance.

ment of these differences in the relevant legislative history, the court is unwilling to characterize the City's 1978 temporary "Renter Property Tax Relief" initiative as a regulation sufficiently similar to the ordinance here in dispute to have placed plaintiffs on notice as to possibility of further regulation of the character subsequently imposed. Absent any provision for eviction control or rent arbitration in the 1978 property-tax rebate initiative, plaintiffs could not have reasonably foreseen the impending legislative nullification of their right to recover possession of their commercial premises until the passage, some two years after execution of the lease, of the Elmwood commercial rent and eviction control ordinance. This conclusion is bolstered by the absence of any similar regulation, anywhere in the nation, for a period of twenty years preceding the making of the contract, and the fact that the prior history of commercial rent control included only the island of Puerto Rico and two cities in the State of New York which adopted controls during war time.

As an alternative basis for the proposition that Berkeley regulated the commercial leasing industry in the particular now objected to by the plaintiffs, the City disingenuously cites its historically extensive experience with residential rent and eviction controls.[10] The court is unwilling to accept the synonymity of the residential and commercial leasing industries for the purposes of Contracts Clause jurisprudence. The vast differences in the relative frequency and extensiveness of rent and eviction regulation in the two fields, and the significant distinctions between the rationales for residential and commercial rent and eviction controls, render the comparision entirely inapposite to the determination of the contracting parties' relevant industry under *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. at 411, 103 S.Ct. at 704.

Finally, defendants argue that Berkeley's history of commercial zoning regulation sufficiently renders the commercial leasing industry regulated for the purposes of this test. By equating commercial zoning, undertaken by the vast majority of American cities, with the undeniable rarity of commercial rent and eviction controls, defendants again construe the delimiting language of Supreme Court precedent so broadly as to eviscerate the Contracts Clause of any force. As in their broad construction of "industry", defendants here construe "prior regulation" so liberally that nearly any legislative act in a particular area would effectively preempt all subsequent Contracts Clause challenges to impairments in the same industry. The implication of defendants' argument is that any legislative limitation on the use of property sufficiently alerts commercial lessors to the potential nullification of their right to recover possession to preclude any subsequent finding of substantial impairment. Defendants argued above that a property tax rebate to renters must have the same effect. Supreme Court authority, though, does not authorize the blanket preemption of all Contracts Clause claims on the basis of prior unrelated regulation within the same industry.

■ The Court in *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. at 38, 60 S.Ct. at 795, held that when one purchases into an industry already regulated "in the *particular*" to which one now objects, one "purchased subject to further legislation *on the same topic.*" (emphasis added) The Court in *Energy Reserves Group v. Kansas Power & Light Co.* approvingly restated the holding of the *Veix* Court, 459 U.S. at 411, 103 S.Ct. at 704, as it had previously in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. at 242, n. 13, 98 S.Ct. at 2721, n. 13. This language clearly implies that the court must look to the nature as well as the act of regulation to determine whether an industry has been sufficiently regulated in the past to preempt a Contracts Clause challenge.

---

10. Berkeley's residential rent and eviction controls recognize owner occupancy as good cause for eviction and lease nonrenewal.

In *Allied Structural Steel Co. v. Spannaus,* the Court held that a Minnesota statute retroactively requiring certain employers to increase substantially their contributions to private pension plans "did not operate in an area subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State." 438 U.S. at 250, 98 S.Ct. at 2725. The "area never before subject to regulation by the State" was the administration of pension plans, 438 U.S. at 245–46, 98 S.Ct. at 2723. Minnesota had engaged previously in the regulation of other aspects of employee compensation, such as wages and disability benefits, but the Court nonetheless determined that the Minnesota Legislature had "[e]nter[ed] a field it had never before sought to regulate ..." with its pension statute. 438 U.S. at 249, 98 S.Ct. at 2725; Minn.Stat.Ann. §§ 176, 181 (West 1966). The "field" therefore was not the broad area of employee compensation but the narrower province of pension plans.

In *Energy Reserves Group v. Kansas Power & Light Co.,* the Court conversely found no substantial impairment caused by Kansas's imposition of certain price controls on natural gas in light of the state's "extensive and intrusive" supervision of the industry. 459 U.S. at 414, 103 S.Ct. at 706. The Court stated that "[a]t the time of the execution of these contracts, Kansas did not regulate natural gas prices specifically, but its supervision of the industry was extensive and intrusive. Moreover, ... the Federal Power Commission (FPC) set 'just and reasonable' rates for prices of gas both at the wellhead and in pipelines. Although prices in the intrastate market have diverged somewhat from those in the interstate market due to the recent shortage of natural gas, the regulation of interstate prices effectively limits intrastate price increases." (footnotes omitted) 459

U.S. at 413–14, 103 S.Ct. at 706. The Court additionally noted that Kansas "in the past has regulated the wellhead price of natural gas." 459 U.S. at 413, n. 17, 103 S.Ct. at 706, n. 17. Against this regulatory backdrop, the Court determined that the industry had been sufficiently supervised in the particular to which plaintiffs objected to render the impairment insubstantial.

■ Considering the holdings in *Energy Reserves* and *Allied Structural Steel,* it is evident that prior regulation must share more in common with the challenged legislation than merely the industry in which it operates to bar a subsequent finding of substantial impairment. In *Energy Reserves,* the Court confronted a regulation within a particular industry that shared the essential features of legislation previously enacted by the state and currently enforced by the federal government. As the Court stated, "[p]rice regulation existed and was foreseeable as the type of law that would alter contract obligations." 459 U.S. at 416, 103 S.Ct. at 707. In *Allied Structural Steel,* the Court conversely dealt with legislation on a specific topic never before reached by state regulation, although other state regulatory efforts had entered the same broad area of economic activity. The instant case falls in the latter category: Berkeley's nullification of an owner's right to recover possession at the end of a lease, while operating within an industry previously subject to regulation, is entirely unrelated in nature to the City's prior legislative efforts to zone for commercial uses or provide for the partial rebate of property tax windfalls.[11]

Ordinance 5640–N.S. and Ordinance 5708–N.S. retroactively and severely upset the contractual expectations of the parties in the instant action, and did so in a field that had not been regulated previously in the particular to which plaintiffs now ob-

---

**11.** *Troy, Ltd. v. Renna,* 727 F.2d 287 (3rd Cir. 1984), heavily relied upon by defendants throughout their papers, is not contrary. The Third Circuit held that a statute extending certain residential tenancies for a period up to forty years was not a substantial impairment, where the state had previously created a non-consensual statutorily-protected tenancy that the legislation in question merely enlarged, and where most of the tenants benefiting from the enlargement were elderly individuals aged 70 (or 58, if surviving spouses). 727 F.2d at 297–98. These facts are easily distinguishable from those of the instant action.

ject. The ordinance thus substantially impairs the contractual obligations of plaintiff lessors and defendant lessees, and must be justified by a significant and legitimate public purpose.

2. *Significant and Legitimate Public Purpose.* A substantial impairment of contract must rest on "a significant and legitimate public purpose ... such as the remedying of a broad and general social or economic problem." (citations omitted) 459 U.S. at 411–12, 103 S.Ct. at 704–05. The level of scrutiny appropriate for this inquiry increases with the severity of the impairment, as does the scrutiny appropriate for the subsequent inquiry into the reasonableness of the measures employed to achieve the legislation's objectives. As the Court stated in *Allied Structural Steel Co.*, "[t]he severity of the impairment measures the height of the hurdle the state legislation must clear.... Severe impairment ... will push the inquiry to a careful examination of the nature and purpose of the state legislation."[12] 438 U.S. at 245, 98 S.Ct. at 2723; 459 U.S. at 411, 103 S.Ct. at 704.

In determining the significance and legitimacy of a public purpose, the court must assure "that the State is exercising its police power, rather than providing a benefit to special interests." 459 U.S. at 412, 103 S.Ct. at 705. Nonetheless, "[w]hether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. at 447–48, 54 S.Ct. at 243. Purposes held to be legitimate under this standard include shielding consumers from the pass-through of increased taxes on oil and gas producers, *Exxon Corp. v. Eagerton*, 462 U.S. 176, 191, 103 S.Ct. 2296, 2306, 76 L.Ed.2d 497 (1983); protecting consumers "from the escalation of natural gas prices caused by deregulation," 459 U.S. at 417, 103 S.Ct. at 707; and protecting mortgage holders from foreclosure during the Great Depression, 290 U.S. 398, 54 S.Ct. 231.

The Court in *Exxon Corp. v. Eagerton* identified an important characteristic of much of the legislation held valid under the Contracts Clause: "[the laws] ... did not prescribe a rule limited in effect to contractual obligations or remedies, but instead imposed a generally applicable rule of con-

12. Defendants argue that the court should ignore the clear implications of *Allied Structural Steel Co.*, refrain from scrutinizing the purpose and reasonableness of the legislation, and adopt with complete deference the City's legislative determination of the wisdom and appropriateness of the regulation. Defendants offer in support of this proposition a theme struck consistently in Contracts Clause jurisprudence: "[u]nless the State itself is a contracting party ... '[a]s is customary in reviewing economic and social regulation, ... courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.'" (citations omitted) 459 U.S. at 412–13, 103 S.Ct. at 705. What defendants fail to acknowledge is that deference in this context clearly pertains to the degree of judicial review, not its forfeiture.

While it is correct that the purpose and reasonableness of legislation altering private contractual arrangements demands greater deference than enactments altering contracts to which the state is a party, the former nonetheless is subject to judicial scrutiny. As the Court in *Allied Structural Steel Co.* noted, "[the holding in *United States Trust Co. v. New Jersey*] indicated that impairments of a State's own contracts would face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties, 431 U.S., at 22–23 [97 S.Ct., at

1517–18], although it was careful to add that 'private contracts are not subject to unlimited modification under the police power.'" 438 U.S. at 244, n. 15, 98 S.Ct. at 2722, n. 15. The Court in *Allied Structural Steel Co.* went on to conclude that given "no showing in the record before us that this severe disruption of contractual expectations was necessary to meet an important general problem[,] [t]he presumption favoring 'legislative judgment as to the necessity and reasonableness of a particular measure' ... simply cannot stand in this case.'" (citations omitted) 438 U.S. at 247, 98 S.Ct. at 2724. Defendants' only rejoinder to this clear authorization of judicial review is that three of the Justices and a law review article took exception to the majority opinion. Defendants' Opposition at 36. Needless to say, this court is bound to abide by the views of the remaining five. (Justice Blackmun did not participate in the decision.) Finally, it must be noted that the Court in *Energy Reserves* restated the holding in *Allied Structural Steel Co.*, observing that "the severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." 459 U.S. at 411, 103 S.Ct. at 704. The reiteration of this principle would be nonsensical if the Court in so doing were not reaffirming the validity of some degree of judicial scrutiny.

duct designed to advance 'a broad societal interest'.... The effect of the pass-through prohibition on existing contracts that did contain [a provision permitting the party to pass tax increases through to purchasers] was incidental to its main effect of shielding consumers from the burden of the tax increase." (citations omitted) 462 U.S. at 191–92, 103 S.Ct. at 2306. The Court went on to distinguish this type of legislative enactment from those struck down in *United States Trust Co.* and *Allied Structural Steel Co.*, which "directly 'adjusted the rights and responsibilities of contracting parties.'" (citations omitted) 462 U.S. at 192, 103 S.Ct. at 2306.

■ The challenged ordinance's exclusion of owner occupancy from the enumeration of good causes for eviction and lease nonrenewal directly targets and adjusts the contractual obligations of lessors and lessees in the Telegraph business district. Unlike a broad rule of general conduct impacting incidentally on the leases in question, it applies exclusively and explicitly to the contractual obligations of the narrow group of lessors and lessees in the Telegraph Avenue commercial district of the City, and confers a direct benefit on one class at the expense of the other. The legislation isolates one group of commercial lessors in the City for contractual readjustment—those in the Telegraph district—and nullifies a central aspect of their contractual rights. Given the severity of the impairment and the narrowly directed focus of the regulation, this court is obliged to scrutinize the purpose of the legislation with some degree of care, as it must subsequently scrutinize the reasonableness of its provisions.

■ The purported public purpose justifying the ordinance's contractual interference has been stated variously as (1) protecting small independent businesspeople (Defendants' Opposition at 35); (2) protecting existing businesspeople (Ordinance 5708–N.S. § 2); (3) protecting Berkeley, as opposed to non-Berkeley, businesspeople (Defendants' Exhibit 2); and (4) preserving the character of the Telegraph Avenue business district and its commercial diversity for the benefit of consumers (Ordinance 5708–N.S. § 2, Defendants' Statement of Undisputed Facts ¶ 6).[13] It is significant to note that only the last of the justifications offered for the legislation discusses a benefit to be conferred on the public generally; the remainder express a bald preference for one class of contracting citizens over another, suggesting the kind of favored treatment that clearly exceeds the state's police power. The final justification—while purporting to benefit the public generally—focuses solely on the relatively subtle objective of preserving a particular shopping district's commercial ambience. This purpose does not readily implicate the "broad and general social problem" required to authorize severe impairments of contract. 459 U.S. at 411, 103 S.Ct. at 704.

The legislation upheld in *Blaisdell* responded to a wave of foreclosures dispossessing citizens of their homes during the Depression; the legislation upheld in *Energy Reserves* and *Eagerton* protected consumers from escalating prices of oil and gas; and the legislation found valid by the Third Circuit in *Troy, Ltd. v. Renna,* so heavily relied upon by defendants, extended the residential leases of elderly citizens for the "broad remedial purpose [of] protecting the mental and physical health of citizens who could suffer greatly by evictions. The legislative findings expressly report that the relocation of elderly and disabled persons is disruptive, costly for themselves and for the state in general, and particularly injurious for these persons who are often limited to fixed incomes." 727 F.2d at 298. Conversely, the narrow rationale of preserving a neighborhood shopping district's diversity—while not an illegitimate subject for legislative enact-

---

13. It remains unclear to the court what the City implies by commercial "diversity". While at certain points it appears to suggest concern over the proliferation of food-related businesses on Telegraph Avenue—presumably at the expense of a broader range of commerce—elsewhere in the papers the defendants focus on variations within a particular kind of business. Thus the Assistant to the City Manager for Economic Development expresses concern that chain bookstores will replace smaller specialty bookstores in the district.

834

ment—is vastly less compelling than the range of public purposes which have typically been held to justify severe impairments of contract.

Nonetheless, in light of the deference with which this court must scrutinize the legislation in question and its obligation to refrain from evaluating the wisdom of the enactment as a matter of policy, it cannot be concluded that Berkeley's desire to preserve the ambience and character of the Telegraph Avenue shopping district sufficiently exceeds the City's police power that it facially fails to justify the enactment's impairment of contract.[14] It must be noted, though, that the nature and significance of this public purpose bears heavily on the court's concluding inquiry into the reasonableness of the measures employed by the City to achieve its objectives. It is the unreasonableness of the enactment's severe provisions, in light of the relative gravity of its public purpose, that ultimately renders Ordinance 5708–N.S. unconstitutional.

### 3. Reasonableness of the Regulation's Conditions and Character.

The final requirement of an enactment substantially impairing the obligation of contracts is that it be based "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." 431 U.S. at 22, 97 S.Ct. at 1518; 459 U.S. at 412, 103 S.Ct. at 705. The ordinance's severe, retroactive, and permanent nullification of plaintiffs' contractual right to recover possession of their premises therefore must be measured against "the public purpose justifying its adoption" to determine the reasonableness of the legislation. Again, given the severity of the contractual impairment, the court must conduct this review with some degree of care.

When a subcommittee of the City's Planning Commission initially proposed to exclude owner occupancy from the enumeration of good causes for eviction or lease nonrenewal in the Telegraph district ordinance, the decision was justified "due to uncertainty as to the potential for abuse of the provision (e.g., landlords not really intending to occupy the property.)" Defendants' Exhibit 8, at 4–5. The subcommittee nonetheless acknowledged the severe implications of the provision and accordingly "'flagged' this as a problem for which strict guidelines might be provided." Id. at 5. The subcommittee's recommendation was never adopted, though, and the blanket owner occupancy exclusion remained in the final version of the legislation without any qualifying or delimiting language. Ordinance 5708–N.S. § 9.

The undisputed factual record before the court gives no indication that the City seriously considered any less restrictive alternatives to the permanent prohibition of owner occupancy. To justify its exclusion of owner occupancy from the enumerated good causes for eviction, Berkeley has relied on an analysis prepared by an urban planner whom it retained during the drafting stages of the ordinance in question. In an affidavit submitted to the court, the consultant states, inter alia, that (1) owner occupancy evictions have traditionally "posed particularly severe abuse problems, especially where rents for vacant units are decontrolled;" (2) other municipalities recently have imposed increasing restrictions on owner occupancy evictions, such as limitations on the frequency with which a landlord may exercise the right to so evict; (3) due to the higher economic stakes in the commercial context, the potential for abuse is even higher than in the area of residential leasing; (4) vacancy decontrol exacerbates the incentive to abuse the owner occupancy provision, given the disparity between controlled and uncontrolled rent lev-

**14.** In the context of the Takings Clause, the Supreme Court has determined—albeit employing a far more deferential standard than appropriate here, given the severity of the contractual impairment—that "this Court has recognized, in a number of settings, that States and cities may enact land-use restrictions or controls to en-

hance the quality of life by preserving the character and desirable aesthetic features of a city...." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 129, 98 S.Ct. 2646, 2661, 57 L.Ed.2d 631, *reh'g denied,* 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978).

els; (5) ownership in a commercial context "may be a far more 'amorphous' concept than owner occupancy in the residential context;" and (6) "[i]n any case, as a practical matter, the threat of owner occupancy could be used either to obtain an agreement to pay higher rents ... or to place the current tenant in a perpetual state of insecurity about the possibility of future eviction." Declaration of Kenneth Baar, at 3–5.

While establishing a rational basis for some type of regulation of owner occupancy evictions, the consultant fails to explicate why less restrictive measures would not adequately minimize the potential abuses; in fact, the consultant acknowledges that other municipalities have responded to the problem, not with a permanent ban on an owner's recovery of possession, but with measures more closely tailored to the objective of regulating bad faith evictions. The consultant does not discuss the merits of these alternatives. The city manager's report on Ordinance 5708–N.S. indicates that his staff considered alternatives such as compensation for evicted businesses and penalties for bad faith evictions, but concluded that "such schemes would not resolve the issues raised by allowing this type of eviction." Defendants' Exhibit 10, at 9. Again, there is no discussion of the reasons for the alleged inadequacy of these alternatives.

Absent any delimiting or qualifying language restricting and tailoring the application of the owner occupancy exclusion, the ordinance in its final form significantly overreaches its stated objectives. As a measure aimed at "maintaining small independent businesses," Defendants' Opposition at 35, the owner occupancy exclusion operates with complete disregard for the commercial size of both the protected tenant and the owner desiring to recover possession. Thus in certain instances the ordinance will quite possibly bar the displacement of large commercial tenants by owners seeking to establish the kind of small, independent businesses which the enactment seeks to assist. Neither does the eviction exclusion allow for any administrative consideration of the present use of the premises vis-a-vis the owner's proposed undertaking; this again allows for a present use to preclude a proposed endeavor which would more effectively promote the purposes of the ordinance.

Finally, this unreasonably overbroad, ill-tailored, and severely restrictive provision operates to advance a public purpose of limited significance. While promoting a particular ambience in a neighborhood shopping district is within the City's police powers, regulations chosen to advance the objective must be "of a character appropriate to the public purpose justifying [the legislation's] adoption." (citations omitted) 459 U.S. at 412, 103 S.Ct. at 705. The permanent nullification of an essential contractual term which effectively grants defendant lessees in the instant action a perpetual leasehold interest in the rented premises hardly can be considered of a character appropriate to the City's policy objectives.[15] While Berkeley may indeed regulate commercial activity to preserve the character of the Telegraph Avenue area, it is constitutionally impermissible for such regulation to reach the dimensions here challenged. The ordinance in question severely, retroactively, and permanently impairs contractual obligations; it does so in a manner which is unreasonably overbroad and ill-tailored to its stated objectives; and it does so in furtherance of a

---

15. The Court in *United States Trust Co. v. New Jersey* indicated that "[u]ndoubtedly the existence of an emergency and the limited duration of a relief measure are factors to be assessed in determining the reasonableness of an impairment, but they cannot be regarded as essential in every case." 431 U.S. at 23, n. 19, 97 S.Ct. at 1518, n. 19. Whether or not one characterizes the potential displacement of merchants in the Telegraph Avenue area as an emergency, the permanent nature of the impairment contributes to the conclusion that the provision in question is unreasonable. Plaintiffs have lost their right, in perpetuity, to regain possession of the premises, irrespective of any subsequent changes in the area which might render the regulation unnecessary. While not conclusive on the issue of unreasonableness, the endless duration of the impairment is a significant factor which the court must weigh heavily against the constitutionality of the ordinance.

public purpose which is itself of limited social significance.[16] Ordinance 5640–N.S. and Ordinance 5708–N.S. thus violate plaintiffs' rights secured under the Contracts Clause of the United States Constitution.

### B. *The Takings Clause*

Plaintiffs alternatively challenge Ordinance 5640–N.S. and Ordinance 5708–N.S. as effecting an impermissible taking of their property without just compensation under the Fifth and Fourteenth Amendments of the United States Constitution. In a recent opinion on facts extremely similar to those at bar, the Ninth Circuit closely analyzed takings jurisprudence in the context of a permanent legislative extension of a fixed residential lease. *Hall v. City of Santa Barbara,* 797 F.2d 1493 (9th Cir.1986). The analysis in *Hall* obviously must guide this court's evaluation of plaintiffs' claim. In determining whether an impermissible taking has occurred, "the court must resolve three questions: (1) Did the governmental action amount to a taking of property? *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000 [104 S.Ct. 2862, 2872, 81 L.Ed.2d 815] ... (1984). (2) Did it advance a legitimate governmental interest? *See, e.g., Agins v. City of Tiburon,* 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106] ... (1980). (3) Was there just compensation? *See, e.g., Kaiser Aetna [v. United States],* 444 U.S. [164,] 179–80 [, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979) ]." *Hall v. City of Santa Barbara,* 797 F.2d at 1497.

1. *The Taking of Property.* The Ninth Circuit in *Hall* correctly observed that takings claims fall into two distinct categories: claims involving regulatory takings, and claims involving physical occupation. 797 F.2d at 1497. The Supreme Court made this distinction and its analytic significance exceedingly clear in *Loretto v. Tele-* *prompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In *Loretto,* the Court observed that "we have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred." 458 U.S. at 426, 102 S.Ct. at 3171. The *Loretto* Court approvingly cited Professor Michelman's observation that " '[t]he one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, "regularly" use, or "permanently" occupy, space or a thing which theretofore was understood to be under private ownership.' " 458 U.S. at 427, n. 5, 102 S.Ct. at 3171, n. 5, quoting Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv.L.Rev. 1165, 1184 (1967). Contrasting a physical occupation case with a regulatory taking, the *Loretto* Court clearly exempted the former from the multifactored balancing test set out in *Penn Central Transportation Co. v. New York City,* 438 U.S. at 124, 98 S.Ct. at 2659: "[t]he Court [in *Penn Central* ] explained that resolving whether public action works a taking is ordinarily an ad hoc inquiry in which several factors are particularly significant.... The opinion does not repudiate the rule that a permanent physical occupation is a government action of such unique character that it is a taking without regard to other factors that a court might ordinarily examine." 458 U.S. at 432, 102 S.Ct. at 3174.

The Court in *Loretto* identified three critical property rights in a physical object that

---

**16.** Again compare the regulation upheld in *Troy, Ltd. v. Renna:* there, "the availability of a protected tenancy depends upon a reasonable personal income test ... and is in any event subject to the exercise of discretion by the New Jersey Courts. Those Courts are directed to consider 'fundamental fairness' in deciding to confer 'some or all' of the Act's protections to eligible tenants." 727 F.2d at 298. Given these reason-

able limitations and conditions tailoring the imposition of the contractual impairment to those circumstances most appropriate for its application, the court concluded that "the 1981 Tenancy Act amply satisfies the requirement of a legitimate and reasonable public purpose." *Id.* The ordinance in question here critically lacks such qualifying provisions.

a permanent physical occupation destroys: " 'the rights to possess, use, and dispose of it.' " 458 U.S. at 435, 102 S.Ct. at 3176, quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). Thus a permanent occupation destroys an owner's "right to possess the occupied space himself, and also [the] power to exclude the occupier from possession and use of the space," 458 U.S. at 435, 102 S.Ct. at 3176; it denies an owner the "power to control the use of the property" and obtain a profit from it, 458 U.S. at 436, 102 S.Ct. at 3176; and "[f]inally, even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property." *Id.*

Applying these factors to the instant case, it is evident that the ordinance in question constitutes a permanent physical occupation.[17] First, plaintiffs obviously have lost permanently their right to possess the property. By the operation of the enactment, tenants are given a leasehold interest of indefinite duration. Since Espresso Roma, Inc. is among the defendant lessees, the protected leasehold is potentially endless in light of the perpetual existence of corporations under California law.[18] Even if the corporation were not a party to the lease, the prohibition on recovery of possession for a period of possibly more than forty years would effectively extinguish the plaintiffs' possessory interest in a permanent manner: it is highly unlikely that either would outlive lessees Boyd and Weigt, both of whom are under thirty years of age. As two commentators approvingly cited by the court in *Hall* observed;

> [t]he Supreme Court ... holds that it is the rights of the *property owner,* not the rights of the *property,* that have significance.
>
> To account for those rights, one must abandon abstract calculations which obfuscate the problem by attempting to relate use prohibitions for periods of years to the perpetual life of the realty. Instead, one must examine the hardship placed on individuals by such actions. Sometimes delay in ability to use property leads to foreclosure. Sometimes the owner dies. Given the reality of inflation, the cost of developing the property may increase. Real estate taxes continue to be demanded, often by the entity which is preventing the property from being used.

Berger & Kanner, *Thoughts on The White River Junction Manifesto: A Reply to the*

---

17. Defendants argue that the holding in *Loretto* specifically exempted its application to eviction protection statutes. The Court did affirm "that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." 458 U.S. at 440, 102 S.Ct. at 3178. The Court went on to cite a number of cases in support of this proposition, including *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) and *Block v. Hirsh*, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921), both of which dealt with the regulation of rental practices. Defendants, though, fail to acknowledge the critical succeeding sentence in the *Loretto* opinion: "In none of these cases, however, did the government authorize the permanent occupation of the landlord's property by a third party." 458 U.S. at 440, 102 S.Ct. at 3178. The *Loretto* Court therefore did not foreclose the possibility that a particular eviction control regulation could constitute a taking if it authorized a permanent occupation of the rented premises.

See also *Hall v. City of Santa Barbara*, 797 F.2d at 1501: "... we cannot indulge the notion that a city may eviscerate a property owner's rights and shield its action from constitutional scrutiny by calling it rent control."

18. Defendants argue that the plaintiffs have not permanently lost their possessory interest, since defendant lessees have offered to waive their rights under the ordinance to an indefinite tenancy and leave after four years. The court in *Hall* disposed of this argument: "We find entirely unpersuasive the city's argument that the ordinance does not give tenants any rights in the landlord's property because the parties are free to change the terms of the lease by mutual consent. That tenants may waive the rights provided for them by the ordinance does not render those rights any less real or valuable. Presumably tenants forego a statutory lease only if the landlord offers them something better. A right is no less a right because it can be traded for something else. Indeed, the contrary is true." 797 F.2d at 1499, n. 16.

*"Gang of Five's" Views on Just Compensation for Regulatory Taking of Property,* 19 Loy. L.A.L. Rev. 685, 744–45 (1986) (emphasis in the original; citations omitted).

This permanent loss of the right to possession, which necessarily implies a loss of the critical right to exclude the current tenants, *Kaiser Aetna v. United States,* 444 U.S. at 179–80, 100 S.Ct. at 392–93, is exacerbated by the potential denial of plaintiffs' capacity to exercise authority over who might occupy the property in the future. While the ordinance does not explicitly nullify an owner's ability to select new tenants, the operation of the legislation easily could render that authority meaningless. Espresso Roma, as a protected tenant under the enactment, possesses an endless leasehold interest in the premises. The corporation itself is alienable through the sale of its stock, and with its sale thus passes the tenancy. The stockholders of Espresso Roma—the individual defendant lessees in this action—therefore can exclusively determine who occupies the premises when they choose to depart, so long as they choose to leave the corporation behind. This situation is closely analogous to *Hall,* where the tenant/owner of a mobile home could exercise control over future occupiers of the underlying property by selecting the purchaser of the mobile home itself—so long as the tenant chose to leave the mobile home behind. 797 F.2d at 1499.

The Telegraph Avenue area ordinance also has the effect of denying plaintiffs their right to fully use and dispose of their property. Defendants argue that plaintiffs have not been denied these rights, since defendant lessees continue to pay rent for the right to occupy the premises and since plaintiffs' right to alienate has not been impaired. Again, the analysis in *Hall* is instructive. There the Ninth Circuit found that even though a property owner continued to collect controlled rents, the fact that a tenant could monetize a significant proportion of the rental's market value by selling his or her mobile home at an inflated price significantly denied the owner the use and disposal of the underlying property. As the court stated, "the tenant is able to derive an economic benefit from the statutory leasehold by capturing the rent control premium when he sells his mobile home. In effect, the tenant is given an economic interest in the land that he can use, sell or give away at his pleasure; this interest (or its monetary equivalent) is the tenant's to keep or use, whether or not he continues to be a tenant." 797 F.2d at 1499.

 The Telegraph Avenue ordinance has created a similar mechanism for the transfer of value. Defendants acknowledge that the market value for commercial premises on Telegraph Avenue typically exceeds the actual rent allowed under the ordinance. As in *Hall,* where the difference between the actual rent paid and the market value of the rented property was recoverable by the tenants through the sale of their mobile homes, so is it recoverable by defendant individual lessees in the instant action through the sale of Espresso Roma. By granting a permanent tenancy at below-market rents to the corporation, the ordinance transfers the value of the "rent control premium"—a concrete and significant asset—to the corporation itself and allows defendant lessees to monetize its value through the sale of stock. The Ninth Circuit clearly views this effect as pivotal to the takings analysis:

This is not a minor difference; it is crucial. The fact that the tenant can sell his interest to third parties drastically affects the economic realities of the landlord/tenant relationship. The typical rent control statute modifies the landlord/tenant relationship somewhat to protect tenants from perceived evils of the free-enterprise system.... By contrast, [the challenged ordinance], as it is alleged to operate, changes the fundamental relationship between the parties, giving landlord and tenant complementary estates in the same land. On the one hand, the landlord loses forever a fundamental aspect of fee simple ownership: the right to control who will occupy his property and on what terms. On the other hand, the tenant gets an interest

that he can liquidate and take with him when he leaves the property. . . .

*Hall v. City of Santa Barbara*, 797 F.2d at 1501. The court there concluded that "as the [ordinance in question] is alleged to operate, landlords are left with the right to collect reduced rents while tenants have practically all other rights in the property they occupy. As we read the Supreme Court's pronouncements, this oversteps the boundaries of mere regulation and shades into permanent occupation of the property for which compensation is due." 797 F.2d at 1502. This analysis controls the instant action; plaintiffs have suffered a taking through defendant lessees' state-authorized permanent occupation of their property, and are thus due just compensation. *See Rivera v. R. Cobian Chinea & Co.*, 181 F.2d 974, 978 (1st Cir.1950) ("For the Legislature to compel the plaintiff against his will to keep his property in the rental market and to prevent him from using it in his own personal business for the duration of the emergency would appear to be a 'taking' of the property. . . .")[19]

■ 2. *Legitimate State Interest.* The second inquiry required of a takings analysis is whether the taking, once established, "advance[d] a legitimate governmental interest." *Hall v. City of Santa Barbara*, 797 F.2d at 1497. The Supreme Court recently has held that this "public use" requirement is "coterminous with the scope of a sovereign's police powers." *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 240, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984). The *Midkiff* Court indicated that while "[t]here is, of course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use, even when the eminent domain power is equated with the police power[,] . . . it is 'an extremely narrow' one." (citations omitted) 467 U.S. at 240, 104 S.Ct. at 2329. The Court suggested a very rigorous standard for this narrow review: "deference to the legislature's 'public use' determination is required 'until it is shown to involve an impossibility.'" *Id.*, citing *Old Dominion Land Co. v. United States*, 269 U.S. 55, 66, 46 S.Ct. 39, 40, 70 L.Ed. 162 (1925). The Court thus concludes that "'whether *in fact* the provision will accomplish its objectives is not the question: the [constitutional requirement] is satisfied if . . . the . . . [state] Legislature *rationally could have believed* that the [Act] would promote its objective.'" (emphasis in original) 467 U.S. at 242, 104 S.Ct. at 2330, quoting *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 671–72, 101 S.Ct. 2070, 2084–85, 68 L.Ed.2d 514 (1981). Under such an exceedingly deferential standard, this court cannot conclude that Berkeley could not have rational-

---

**19.** Defendants argue that the holding in *Fresh Pond Shopping Center, Inc. v. Callahan*, 464 U.S. 875, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983), is controlling. The Court there summarily affirmed for want of a substantial federal question a decision by the Massachusetts Supreme Judicial Court upholding an ordinance that barred an owner from evicting residential tenants, where the owner wished to demolish the premises and replace the building with a parking lot. First, the court must note that while a summary affirmance is binding as a decision on the merits under *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), it is a very narrow precedent indeed. As the Court stated in *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), "[s]ummary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions. . . . Summary actions, however . . . should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." The precise issue before the Court in *Fresh Pond* was the constitutionality of an ordinance protecting residential tenants from eviction for purposes of a subsequent demolition. There is no indication in the record that the tenants were capable of monetizing any of their leasehold interest; that the lease extension effectively operated in perpetuity; that the Court's analysis would apply in the commercial leasing context; nor that the removal of housing stock and its replacement with a parking lot would be analytically indistinguishable from the proposed substitution of one commercial proprietor for another. *See Hall v. City of Santa Barbara*, 797 F.2d 1498, n. 14 ("*Fresh Pond* is distinguishable from this case in material ways that we presume were the basis for the majority's decision.") The facts in *Hall* are far more analogous to the instant action, and thus control.

ly believed that its prohibition of owner occupancy evictions would promote its objective of preserving the ambience and character of the Telegraph Avenue commercial district. *See Penn Central Transportation Co. v. New York City*, 438 U.S. at 129, 98 S.Ct. at 2661–62 (preserving the character and "desirable aesthetic features of a city" a valid exercise of the state's police power).

The Ninth Circuit in *Hall* suggests in dicta that this extremely rigorous standard is possibly inappropriate in cases where the taking did not occur pursuant to a deliberate exercise of the state's eminent domain authority. 797 F.2d at 1502. The *Hall* court tentatively suggests the limitation of *Midkiff* to cases involving the conscious use of a state's eminent domain authority, and argues in justification that where the legislature "may have stumbled into exercising [eminent domain authority] through actions that incidentally result in a taking[,] ... [a deferential] court ... may be thwarting the legislative will by ordering compensation where the legislature had no intention of engaging in a compensable transaction." 797 F.2d at 1503, n. 25. While the *Hall* court thus concludes that "[t]he test in inverse condemnation cases may well be more stringent," it does not attempt to articulate the alternative standard nor analyze the facts less deferentially than under the *Midkiff* standard. 797 F.2d at 1503.

The only alternative standard of deference cited by the court in *Hall* is language from the Supreme Court's opinion in *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980), establishing that a taking occurs when "the application of a general zoning law to particular property ... does not substantially advance legitimate state interests, see *Nectow v. Cambridge*, 277 U.S. 183, 186 [48 S.Ct. 447, 448, 72 L.Ed. 842] (1928)...." There are a number of difficulties involved in employing this authority for the proposition suggested in *Hall*. First, the language does not establish a standard of deference for inquiry into the public use requirement, but rather represents an alternative formulation of the requirement

itself. Second, the cited authority in *Nectow* actually turned on due process grounds and thus did not interpret the public use requirement of the Takings Clause. Finally, while *Nectow* did involve judicial scrutiny of a regulation's public purpose that resulted in the invalidation of challenged legislation, the Court there relied on a standard of deference developed in the context of due process jurisprudence which on its face is not appreciably less rigorous than that announced in *Midkiff*: "unless it is clear that [the state's] action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to [the police power],'" the enactment must be upheld. 277 U.S. at 187, 48 S.Ct. at 448. Given the uncertainties involved in interpreting the language in *Agins*, and absent a clearer statement of the alternative standard of deference hinted at in *Hall*, this court remains obliged to follow *Midkiff* as controlling authority for the standard of deference appropriate to the analysis of public use under the Takings Clause.

■ 3. *Just Compensation.* Plaintiffs' property was taken for a legitimate public use. They therefore are entitled to just compensation for their loss. Plaintiffs' only compensation at this point is the controlled rents which they receive pursuant to the challenged ordinance. The Ninth Circuit in *Hall* clearly indicated that plaintiffs have a right to additional compensation, and suggested how such compensation should be determined:

Here, the rental payments compensate the Halls for use of the land during the rental period, plus whatever amenities they provide tenants. However, if their claim is substantiated, the Halls are entitled to additional compensation for the taking of their property: the possessory interest in the land allegedly transferred to each of their tenants. It may well be that the rental payments (together with such increases as are permitted under the ordinance) adequately compensate the Halls for the taking of their property. However, this cannot be assumed; it must be proven. To make this determi-

nation, the court must ascertain the value of the interest allegedly transferred to each tenant and the value of what the Halls received, if anything, in addition to normal rental payments. 797 F.2d at 1504. Justice Rehnquist, dissenting in *Fresh Pond Shopping Center, Inc. v. Callahan,* 464 U.S. at 878, 104 S.Ct. at 220, described the type of loss suffered by plaintiffs as "a transfer of control over the reversionary interest retained by appellant."[20]

Plaintiffs thus have suffered losses which the court cannot assume are reflected in the compensation they receive for the rental of their premises: the reversionary interest in the possession of their property. The court in *Hall* nonetheless indicated that it might be possible to compensate such a loss adequately by "the rental payments (together with such increases as are permitted under the ordinance)...." 797 F.2d at 1504. Clearly, then, this court must look to the compensation available through the City's administrative processes. Specifically, the court must determine whether the rent arbitration procedure established under Ordinance 5708–N.S. § 7 can provide adequate compensation to plaintiffs for the loss that they have experienced.

If the arbitration procedure is capable of so compensating plaintiffs, their claim is not now ripe, since they have not yet petitioned for any rental adjustment under § 11(b) of the ordinance. "[A] court cannot determine whether a municipality has failed to provide 'just compensation' until it knows what, if any, compensation the responsible administrative body intends to provide." *MacDonald, Sommer & Frates v. Yolo County,* —— U.S. ——, 106 S.Ct. 2561, 2566–67, 91 L.Ed.2d 285 (1986). As the Court in *Williamson County Regional Planning Comm'n v. Hamilton Bank of*

*Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 3121 n. 13, 87 L.Ed.2d 126 (1985), explained, "because the Fifth Amendment proscribes takings *without just compensation,* no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action." (emphasis in the original) Thus "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* 105 S.Ct. at 3121.

While it is clear from the face of the ordinance that it does not explicitly contemplate the provision of compensation for the kind of taking here inflicted, the rent arbitrator nonetheless possesses significant discretion to set a "reasonable rent increase for the current year and the subsequent five years." Ordinance 5708–N.S. § 7(a). Although the ordinance admonishes the arbitrator to give "particular weight" to the first of the eighteen enumerated criteria—"the extent to which a business contributes to the uniqueness and diversity of the Telegraph Avenue Area and to the availability of goods and services in the Telegraph Avenue Area and the city"—and although none of the remaining criteria mention an owner's loss of his or her reversionary interest in possession, the last criterion does allow the arbitrator to consider "[a]ll other relevant factors." *Id.* at § 7(a)(i)—(xviii). Before this court can determine that the City has denied just compensation for the taking of plaintiffs' property, plaintiffs must invoke the City's rent arbitration procedure and test the discretion invested in the arbitrator to adequately compensate them for their loss.[21]

---

**20.** The court in *Hall* indicated that the Ninth Circuit does "not interpret the *Fresh Pond* dismissal as repudiating everything said by Justice Rehnquist in his dissent." 797 F.2d at 1498, n. 14. *See also* note 19, *supra.*

**21.** The court must note that defendants evince no appreciation of the full scope of compensation required by their taking of plaintiffs' prop-

erty. They state that "although the permanent ordinance provides a controlled rent, that *is* just compensation." (emphasis in the original) Defendants' Opposition at 25. While this statement suggests that the plaintiffs should not be overly optimistic about the ultimate sufficiency of the City's administrative remedy, they must

The motion for summary judgment on plaintiffs' § 1983 claim for the violation of rights secured under the Takings Clause of the United States Constitution therefore is denied.

## C. *The Due Process Clause*

In conclusion, plaintiffs move for summary judgment under the Due Process Clause of the Fourteenth Amendment for the deprivation of property in violation of their fundamental substantive rights. The Court in *Lawton v. Steele*, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894), outlined the theory of substantive due process in terms since described as "classic," *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594–95, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962): "[t]o justify the State in thus interposing its authority in behalf of the public it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals." 152 U.S. at 137, 14 S.Ct. at 501. Relying on a substantive due process analysis, the Court struck down a zoning ordinance in *Nectow v. City of Cambridge*, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928).[22]

The substantive due process analysis of economic legislation used in the *Lochner* line of cases has been categorically rejected. Close judicial review of the nature employed in *Nectow* has been supplanted by an extremely deferential standard for legislative rationality: only if there is no rational relation between an economic enactment and its objective will legislation be held to exceed the sovereign's police powers. *See, e.g., Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563, *reh'g denied*, 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256 (1955); *Ferguson, Attorney General of Kansas v. Skrupa*, 372 U.S. 726, 730–31, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963); *Goldblatt v. Town of Hempstead*, 369 U.S. at 595–96, 82 S.Ct. at 990–91; *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 19, 96 S.Ct. 2882, 2894, 49 L.Ed.2d 752 (1976). This court, exercising the deference required under these cases, cannot conclude that the Telegraph Avenue ordinance is so irrational that it violates plaintiffs' substantive due process rights.[23]

Recently there have been indications that the Supreme Court may be reconsidering its withdrawal of substantive due process analysis from the constitutional evaluation of economic regulations. Justice Stevens,

---

nonetheless allow Berkeley the opportunity to act upon its word.

**22.** The Court in *Nectow* employed as its standard of review whether "[the state's] action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.'" 277 U.S. at 187–88, 48 S.Ct. at 448, quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). While the standard is facially deferential, the Court in *Nectow* invalidated the legislation on the basis of an earlier, detailed review of its rationality. 277 U.S. at 187, 48 S.Ct. at 448.

**23.** On facts extremely similar to this action, the First Circuit held in *Rivera v. R. Cobian Chinea*, 181 F.2d at 974, that an emergency statute restricting an owner's right to recover possession solely for his own commercial use deprived the landlord of property without due process of law. 181 F.2d at 978. The court held that the statute "went beyond the bounds of the police

power and adopted an expedient which did not have any reasonable relation to the establishment and maintenance of the rent ceilings which it was the object of the [statute] to accomplish." *Id.* Significantly, the court stated that "[w]e think that it was the purpose of [the statute] thus to implement the enforcement of the rent ceilings imposed by the act. We, therefore, do not have to consider whether the Legislature might under the police power impose such absolute prohibitions against eviction as are here involved in an act designed to stabilize in an emergency the possession of leased premises by the tenant occupants." *Id.* at 977. The kind of justification underlying the ordinance here in question, intended to preserve the character of the Telegraph district through rent and tenancy stabilization, thus was not analyzed by the court in *Rivera* as a purpose of the owner occupancy prohibition there found irrational. Nonetheless, to the extent that the holding in *Rivera* contradicts the resolution here reached, it must be noted that since *Rivera* there have been thirty-five years of substantial deference on the part of the Supreme Court when reviewing economic legislation.

writing in concurrence in *Moore v. City of East Cleveland,* 431 U.S. 494, 514–15, 97 S.Ct. 1932, 1943–44, 52 L.Ed.2d 531 (1977), chose to evaluate a statute limiting the occupants of a house to nuclear family members as violative of the substantive protections of property ownership rather than of "family rights," as determined by the majority. Citing the extensive state court development of substantive due process protections in the area of property rights, Justice Stevens strongly endorsed the continuing vitality of the "limited standard of review of zoning decisions which this Court preserved in *Euclid* and *Nectow.*" 431 U.S. at 520–21, 97 S.Ct. at 1946–47. The majority in *Moore* additionally acknowledged the continuing validity of *Nectow* and *Euclid* in the land-use context, at least for the proposition "that the government's chosen means must rationally further some legitimate state purpose." 431 U.S. at 498, n. 6, 97 S.Ct. at 1935, n. 6. Perhaps most significantly, the Court in *Lynch v. Household Finance Corp.,* 405 U.S. 538, 552, 92 S.Ct. 1113, 1122, 31 L.Ed.2d 424, *reh'g denied,* 406 U.S. 911, 92 S.Ct. 1611, 31 L.Ed.2d 822 (1972), stated that "the dichotomy between personal liberties and property rights is a false one.... The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right...." This suggests the possible extension to property interests of the significant substantive protections now reserved for certain noneconomic interests, such as privacy. *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, *reh'g denied,* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

The Court has suggested recently in dicta that a substantive due process claim for the deprivation of property also might be based on the holding in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), which traditionally has been viewed as a takings case. Initiating the "regulatory takings" jurisprudence, Justice Holmes wrote in *Pennsylvania Coal* that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415, 43 S.Ct. at 160. The Court in *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City* noted that

> [t]hose who argue that excessive regulation, should be considered a violation of the Due Process Clause rather than a "taking" assert that *Pennsylvania Coal* used the word "taking" not in the literal Fifth Amendment sense, but as a metaphor for actions having the same effect as a taking by eminent domain.... Because no issue was presented in *Pennsylvania Coal* regarding compensation, it is argued, the Court was free to use the term loosely.
>
> The due process argument finds support, we are told, in the fact that the *Pennsylvania Coal* Court framed the question presented as "whether the police power can be stretched so far" as to destroy property rights ... and by the Court's emphasis upon the need to proceed by eminent domain rather than by regulation when the effect of the regulation would be to destroy property interests[.]

(citations omitted) 105 S.Ct. at 3123. The *Williamson* Court goes on to observe that "in earlier cases involving the constitutional limitations on the exercise of police power, Justice Holmes' opinions for the Court made clear that the Court did not view overly restrictive regulation as triggering an award of compensation, but as an invalid means of accomplishing what constitutionally can be accomplished only through the exercise of eminent domain." *Id.* The Court nonetheless concluded that "[w]e need not pass upon the merits of petitioners' arguments, for even if viewed as a question of due process, respondent's claim is premature." *Id.*

 The *Williamson* Court's commentary, while dicta, suggests that an entirely different substantive due process analysis may be appropriate when one suffers a taking at the hands of the state through means other than eminent domain. Apparently under this theory, a taking ab-

sent the deliberate procedure of eminent domain would constitute a *per se* violation of substantive due process, remedied by invalidation of the legislation in question and actual damages, if appropriate. This court, though, cannot ignore over four decades of clear precedent in favor of suggestive dicta. Until the Supreme Court states with clarity and certainty what, if anything, was intended by its language in *Williamson*, or alternatively reaffirms its *Nectow* precedent in the post-*Lochner* era, substantive due process claims for the deprivation of property must be judged against the consistent line of precedent requiring a showing of legislative irrationality.[24] Plaintiffs have not made such a showing. The court therefore must deny plaintiffs' motion for summary judgment on their § 1983 claim for the violation of rights secured under the Due Process Clause of the Fourteenth Amendment.

ACCORDINGLY, plaintiffs' motion for summary judgment on claims brought under the Takings Clause of the Fifth and Fourteenth Amendments of the United States Constitution, and under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, are denied. Furthermore, because "it [has been] made to appear from all the records, files, affidavits and documents presented that there is no genuine dispute respecting a material fact essential to the proof of movant's case and that the case cannot be proved if a trial should be held," and all parties having had a full opportunity to be heard on the issues, the court may grant summary judgment to the nonmoving party on these claims. *Cool Fuel, Inc. v. Connett*, 685 F.2d 309, 311 (9th Cir. 1982). Plaintiffs' failure to raise a genuine dispute of fact with respect to both the legislative irra-

tionality of the defendant's enactment under the Due Process Clause as well as their exhaustion of the City's administrative processes available for just compensation under the Takings Clause obviates the need for further consideration of either claim, and entitles the City to judgment.

Plaintiffs' motion for summary judgment on their § 1983 claim for the violation of rights secured under the Contracts Clause of the United States Constitution is granted. The absolute exclusion of owner occupancy from the enumeration of good causes for eviction and lease nonrenewal under Berkeley, Cal., Ordinance 5640–N.S. § 6 and Ordinance 5708–N.S. § 9 renders unconstitutional and invalid the retroactive application of the challenged eviction provisions to leases formed prior to the passage of the City's Elmwood rent and eviction control ordinance in 1982.

IT IS SO ORDERED.

---

**24.** The court is also bound by the holding in *In re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301 (9th Cir.1982). There the Ninth Circuit held that when a party claims both a deprivation of due process and a taking without just compensation, the due process claim can only be reached if the loss claimed is not compensable. "There are some government regulations for which no adequate compensation could be paid, because they deprive persons of some aspect of life or liberty. In these cases, the regulation may be a violation of substantive due process.... There are cases, however, in which both a deprivation of substantive due process and a taking without just compensation are claimed.... Generally, if the loss claimed is compensable, the regulation will not be found unconstitutional." (citations omitted) 684 F.2d at 1311. Thus, since plaintiffs' loss of property is compensable in nature, their appropriate remedy is under the Takings Clause.