**INTERNATIONAL SPORT DIVERS AS-SOCIATION, INC. and Richard P. Ewing d/b/a International Sport Divers Association, Inc., Plaintiffs,**

v.

**MARINE MIDLAND BANK, N.A., Defendant.**

Nos. 95–CV–0438C(M), 95–CV–438C(H).

United States District Court, W.D. New York.

July 7, 1998.

Michael A. Brady, Hagerty & Brady, Buffalo, NY, for Plaintiffs.

John G. Schmidt, Jr., Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY, Michael T. Ryan, Buffalo, NY, Scott D. Miller, Buffalo, NY, for Defendant.

CURTIN, District Judge.

On May 27, 1998, United States Magistrate Judge Carol E. Heckman filed a report and recommendation. Neither plaintiff nor defendant has filed objections to the report. Further, the court has had an opportunity to review the contents of the report, and the court finds that the report is in good order and should be affirmed.

Therefore, the court adopts the recommendation of the Magistrate Judge. The court grants the defendant's motion for summary judgment dismissing the complaint (Item 75). The court denies plaintiffs cross-motion for summary judgment (Item 78), and grants defendant's counterclaim as to its sixth cause of action. The Clerk is directed to enter judgment in favor of the defendant and against plaintiff Richard P. Ewing in the sum of $17,278.57, plus interest and costs.

So ordered.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

This matter was referred to the undersigned by the Hon. John T. Curtin for pretrial matters, and to hear and report on dispositive motions, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). Presently before the court are defendant's motion for summary judgment (Item 75), and plaintiffs' cross-motion for summary judgement (Item 78). For the reasons that follow, it is recommended that defendant's motion be granted, and that plaintiff's motion be denied.

### BACKGROUND

On September 2, 1992, Marine Midland Bank, N.A. (Marine) and International Sport Divers Association, Inc. (ISDA) entered into a credit card program agreement (Item 75, Ex. S). Marine is an issuer of VISA credit cards. ISDA is a membership organization of recreational scuba divers.

The agreement in question involves the issuance of "affinity credit cards." Affinity cards bear the name of a company or group, such as ISDA, but are issued and serviced by a bank, such as Marine (Item 75, MacKenna Aff. ¶ 4). It is hoped that consumers having an affinity with the mission or purpose of a particular company or group will want to use a credit card associated with that purpose (Id.). Marine pays royalties to affinity groups in exchange for the right to solicit their members or customers (Id.; Item 75, Ex. S, ¶ 2.9).

The affinity card agreement reached between the parties was signed by David M. Frank, as Assistant Vice President of Marine Midland Bank, N.A., and plaintiff Richard P. Ewing, as President of International Sport Divers Association, Inc (Id.). Although the contract refers to ISDA as "a Connecticut corporation," that entity was not formally incorporated under the laws of Connecticut

at the time the agreement was entered into (Item 75, Ex. S, p. 1; Item 80, ¶ 9; Item 86, ¶ 9).

The contract provides that the affinity card program was to operate for an initial term of three years, unless terminated by one of the parties upon written notice (Item 75, Ex. S, ¶ 3.1). The contract also contains an integration clause which provides that the written agreement represents the entire understanding and agreement of the parties (Item 75, Ex. S, ¶ 4.12).

Plaintiffs commenced this action in the Superior Court of Connecticut on December 4, 1996, claiming that defendant had failed to perform its obligations under the contract (Id., Ex. C). Defendant removed the case to the United States District Court for the District of Connecticut, and the parties subsequently agreed that the matter would be transferred to the Western District of New York (Items 1, 18).

In their Second Amended Complaint, filed with this court on April 1, 1997, plaintiffs allege that defendant was obligated to operate the affinity card program at its sole expense and risk, and that it breached the instant agreement when it failed to perform its obligations (Item 51, ¶¶ 7, 8, 11). Specifically, plaintiffs claim that defendant was obligated to test 50,000 direct mail credit card solicitations on behalf of plaintiffs in 1992, with additional solicitations in 1993, and that it failed to do so (Id. at ¶¶ 8, 18). The dispute centers on which party was responsible under the contract for acquiring the names and addresses of potential applicants to be used in the test mailing. Plaintiffs also claim that defendant's conduct violated N.Y.Gen.Bus.Law § 349 and the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. § 42–110a et seq. (Id. at ¶¶ 13–19).

On December 22, 1997, defendant moved for summary judgment on the grounds that 1) no valid contract was formed, 2) plaintiffs fail to state a claim under N.Y.Gen.Bus.Law § 349, 3) plaintiffs fail to state a claim under the Connecticut Unfair Trade Practices Act, and 4) plaintiffs are entitled only to actual damages, of which they have no proof (Item 76). In its brief, defendant also argues for summary judgment on its sixth counterclaim,

which alleges that plaintiff Ewing entered into a credit card agreement with Marine in his own name, that he defaulted under the agreement by exceeding his credit limit and failing to make payments, and that an outstanding debt exists (Id.; Item 58 ¶¶ 48–59).

On February 4, 1998, plaintiffs responded to defendant's motion and also cross-moved for summary judgment on the grounds that 1) a valid, enforceable agreement exists, 2) the doctrine of corporation by estoppel applies, and 3) defendant breached its contractual obligations when it failed to complete the 50,000 piece mail solicitation in 1992 (Items 78, 79).

### DISCUSSION

### I. SUMMARY JUDGMENT.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reaching this determination, the court must assess whether any material factual issues exist to be tried while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.,* 933 F.2d 162, 166–67 (2d Cir.1991). As stated by the Second Circuit:

> [T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.... It must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute.

*Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994).

Once the moving party has met its burden of demonstrating the absence of a

genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a "metaphysical doubt" concerning the facts, or on the basis of conjecture or surmise. *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991) (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Furthermore, the court will examine the substantive law applicable in the underlying litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment will be granted against a party that has failed to offer proof sufficient to establish the existence of an essential element of its case. *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993).

## II. CHOICE OF LAW.

The parties in this diversity action rely on a mix of New York and Connecticut law to support their claims. They do not address the choice of law issue.

■ Where, as in the present case, litigants transfer a case from one venue to another under the convenience transfer statute, 28 U.S.C. § 1404(a), the transferee court must apply the choice of law rules of the state in which the transferor court sits. *Ferens v. John Deere Co.,* 494 U.S. 516, 521–32, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990); *Van Dusen v. Barrack,* 376 U.S. 612, 626–40, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). In other words, this court must apply Connecticut's choice of law rules in determining which state's substantive law will apply to the contract formation and breach of contract questions presented here.

■ Although neither party refers to the contract itself in this regard, I note that the contract contains a forum selection clause which provides that the "[a]greement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles" (Item 75, Ex. S, 14.13). In general, there is a "strong public policy in favor of [such] forum selection ... clauses." *International Minerals and Resources v. Pappas,*

96 F.3d 586, 592 (2d Cir.1996) (quoting *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.), *cert. denied,* 510 U.S. 945, 114 S.Ct. 385, 126 L.Ed.2d 333 (1993)). The question here is whether this particular clause is enforceable under Connecticut law.

■ Connecticut follows the rule that absent a showing of fraud or overreaching, forum selection clauses will be enforced by the courts. *United States Trust Co. v. Bohart,* 197 Conn. 34, 495 A.2d 1034, 1040 (1985) (assessing enforceability of forum selection clause under minimum contacts test) (citing *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 10–12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972)). When the forum selected is reasonably appropriate, and there is no indication that the parties had such greatly disproportionate bargaining power that the agreement could be regarded as unconscionable, the tendency is to give effect to such agreements. *Fairfield Lease Corp. v. Romano's Auto Service,* 4 Conn.App. 495, 495 A.2d 286, 289 (1985) (quotation omitted).

■ Here, the parties have not questioned the validity of this clause or its applicability to the present motion. In the absence of any claim that the forum selection clause was affected by fraud, undue influence or unequal bargaining power, I find that it is enforceable under Connecticut law. Accordingly, this court will apply New York law to the contract formation and breach of contract questions presented, should it be necessary to reach those issues.

## III. VALIDITY OF THE CONTRACT.

Defendant advances four arguments in support of its claim that the contract at issue is invalid and unenforceable. First, Marine claims that, while it believed it was contracting with a corporate entity, ISDA was not a corporation at the time of the agreement. Defendant concludes that because the agreement was executed by a nonexistent party, there can be no contract as a matter of law. Second, Marine argues that Richard Ewing, who signed the agreement as president of ISDA, is not a party to the contract and cannot sue on it. Third, Marine claims that plaintiffs fraudulently induced it to enter into

the contract by misrepresenting ISDA as an corporate entity. Finally, Marine argues that ISDA was not a de facto corporation or a corporation by estoppel, as is alleged in plaintiffs' complaint.

It is undisputed that ISDA was not formally incorporated under the laws of Connecticut at the time the contract with Marine was executed. The first issue to consider, then, is whether ISDA was a de facto corporation at that time, or whether it may now be considered a corporation by estoppel.

■ While New York law governs the formation and construction of the disputed contract. the validity of ISDA's incorporation is tested by the law of Connecticut, the state of its corporate domicile. *Saxe, Bacon & Bolan, P.C. v. Martindale–Hubbell,* 710 F.2d 87, 89 (2d Cir.1983); *In re Servo Systems, Inc.,* 11 B.R. 879, 883 (Bankr.S.D.N.Y.1981) (citations omitted); *Demarest v. Grant Et Al,* 128 N.Y. 205, 215, 28 N.E. 645 (1891).

### A. *ISDA's Corporate Status.*

#### 1. De Facto Corporation.

■ In certain circumstances, a state will attribute corporate incidents to an enterprise despite its failure to comply with all of the statutory prerequisites for formal incorporation. *In re Servo Systems, Inc.,* 11 B.R. at 883. Under Connecticut law, a business entity is a de facto corporation where there is a law authorizing such a corporation, the company has made a good faith effort to organize under the law, and it is operating for all practical purposes as a corporate body. *Clark–Franklin–Kingston Press, Inc. v. Romano,* 12 Conn.App. 121, 529 A.2d 240, 242, *cert. denied,* 205 Conn. 803, 531 A.2d 935 (1987) (citing Cook, Corporations (8th Ed.) p. 773, § 234 and 14 C.J. § 215).

For instance, in *Chieppo v. Chieppo,* 88 Conn. 233, 90 A. 940 (1914), the defendants had begun the process of incorporation pursuant to state statute, but had not completed the requisite filings when they executed a note on behalf of the corporation. The plaintiff sought to hold the individual defendants personally liable on the note on the ground that the corporation was a nonexistent entity that did not have the legal capacity to con-

tract. After determining that the defendants had filed a certificate of incorporation prior to executing the note and that all parties believed the defendant corporation was legally authorized to execute same, the court found that the corporation was a de facto corporation at the time of the transaction. *Id.* 90 A. at 941–42.

In *Di Francesco v. Kennedy,* 114 Conn. 681, 160 A. 72 (1932), the defendant company had filed a certificate of incorporation, but did not file a certificate of organization within two years as required by statute. The plaintiff claimed that because of this defect in procedure, the defendant was not a corporation during the time of the transaction at issue and that its acts as such were void. *Id.* 160 A. at 74. The court noted that from the time the defendant company filed its certificate of incorporation, it had conducted business as a corporation, including filing reports and taxes as a corporation and holding stockholders' and directors' meetings. *Id.* 160 A. at 73. The court found that the defendant company became a de facto corporation on the day the certificate of incorporation was approved by the Secretary of State. *Id.* 160 A. at 74.

More recent decisions by Connecticut's appellate courts have reached similar conclusions, holding that de facto corporate status exists where the party 1) affirmatively attempts to incorporate under the existing laws, 2) believes that it was successful, and 3) thereafter conducts its business as a corporation. *See Ocean State Restaurant Equip. and Supply, Inc. v. Egg Roll King, Inc.,* No. CV–89–0509579–S, 1990 WL 269130 (Conn.Super. July 30, 1990) (no de facto corporation where defendants, after learning that corporation had never been legally formed, made no immediate good faith attempt to incorporate); *Clark–Franklin–Kingston Press, Inc.,* 12 Conn.App. 121, 529 A.2d 240 (de facto corporation existed where defendants attempted to reinstate corporation, believed they were successful, and upon realizing they were not, again sought to reinstate).

■ In the present case, defendant argues that ISDA was not a de facto corporation at

the time the contract was executed because plaintiffs did not make a good faith attempt to incorporate, nor did they believe that ISDA was a corporation. Defendant maintains that Richard Ewing's admissions are fatal to plaintiffs' claim of de facto status. At his deposition, Ewing stated that he did not attempt to incorporate ISDA before executing a contract with Marine as ISDA's president, and more specifically, that he did not file any incorporation papers with the Secretary of State (Item 75, Ex. N, pp. 202–203, 281–82, 615–19). In addition to Ewing's statements, defendant relies on plaintiffs' failure to produce any documentation in response to discovery demands that relate to attempts to incorporate ISDA (Id. at Exs. H, I, J, K).

In response, plaintiffs note that Ewing applied for the reservation of the corporate name of "International Sport Divers Association, Inc." on August 13, 1994 (Item 78, Ex. A). Furthermore, they argue in their brief that "Ewing had every intention of incorporating prior to signing the Agreement, [but] simply failed to do so" (Item 79, p. 9; Item 78, Ex. V, pp. 868–73. 1108–09).

■ Under the standards set forth above, an intent to incorporate, without more, is not sufficient to establish a de facto corporation. *See Ocean State Restaurant Equip. & Supply, Inc.*, 1990 WL 269130 at *1, 4; *see also, Kidd v. Hilton of San Juan, Inc.*, 251 F.Supp. 465, 468 n. 1 (D.C.Puerto Rico 1966) ("attempt" is not a synonym of desire or intention).

The only piece of evidence tending to show de facto incorporation is the application to reserve a corporate name. Although plaintiffs did take this preliminary step, they apparently allowed that reservation to expire approximately ten months before the agreement at issue was entered into.[1] By plaintiff Ewing's own admission, he did not take any steps to incorporate ISDA either before entering into the subject agreement or immediately thereafter. Under the case law cited above, the temporary reservation of a corporate name is not sufficient to raise a question

of fact as to whether plaintiffs made a good faith attempt to incorporate. In all of the cited cases, the disputed entity had either been legally incorporated and then later dissolved, or had at least initiated the formal incorporation process by filing a certificate of incorporation. *See also, Harrill v. Davis*, 168 F. 187, 191–93 (8th Cir.1909) (holding, upon reviewing numerous cases, that de facto corporation arises only where the entity has procured a charter or filed articles of incorporation under an enabling act, and thereafter believes that it is a legal corporation).

In addition to maintaining that they intended to incorporate, plaintiffs rely on the third element of their claim, asserting that they operated as a corporation in every material respect before the contract was entered into. Upon review, I find that plaintiffs have not come forward with evidence sufficient to suggest that ISDA conducted its business as a corporation.

■ Plaintiffs point to Ewing's testimony that ISDA had bank accounts and employees and also engaged vendors (Item 78, Ex. V, pp. 64–67, 868–73, 1108–09). While such activity certainly indicates that ISDA was conducting business, it is not necessarily evidence of a corporate enterprise. In *Difrancesco*, the court looked to the entire operation of the disputed organization to assess whether it conducted its business as a corporation. In particular, it noted the presence of activities unique to corporations, such as filing corporate tax returns and annual reports, and holding stockholder and board of directors meetings. 160 A. at 73. The general nature of Ewing's testimony, absent any supporting documentary evidence, is insufficient to distinguish ISDA's business activities as those of a corporate enterprise. In fact, Ewing testified that he filed a d/b/a for ISDA, a designation used for a non-corporate entity (Item 73, Ex. V., p. 869).

■ Plaintiffs go on to characterize the issue of corporate formation as a "red herring," asserting that Marine was so eager for affinity card business that it was willing to

---

1. The application, filed on August 13, 1991, provides that the name reservation is good for 120 days from the date filed. Plaintiffs have not come forward with evidence to demonstrate that they took any further steps toward incorporation.

contract with ISDA regardless of its corporate status. However, Marine's intent is not material to the question of ISDA's de facto status or its capacity to contract.

In sum, I find that defendant has met its initial burden of demonstrating that ISDA was not a de facto corporation at the time of contracting, and that plaintiff has failed to raise any genuine issue of fact in that regard.

### 2. Corporation by Estoppel.

■ In general, one who contracts or deals with an entity as a corporation thereby admits that the entity is a corporation and is estopped to deny its incorporation in an action arising out of the contract or course of dealing. Fletcher Cyclopedia Corporations § 3910 (perm. ed.1992). It is evident on the face of the agreement at issue that defendant Marine contracted with "International Sport Divers Association, Inc...., a Connecticut corporation" (Item 75, Ex. S, p. 1).

Plaintiffs contend that because Marine contracted with ISDA as a corporation and then used the contract to its benefit, it is now estopped under the principle set forth above from denying the corporation's existence.

Defendant argues that the general rule does not apply because estoppel is premised upon a lack of fraud in the dealings between the parties. Marine asserts that the circumstances and equities of this particular case do not warrant the application of that doctrine. In particular, defendant contends that plaintiffs knew ISDA was not a corporation, and that their knowledge precludes them from claiming the benefits of estoppel.

> Inasmuch as the rule [of estoppel] originates in equitable principles, it does not apply when it would be inequitable to apply it, or where equitable principles do not require its application, as in the case of fraud.

Fletcher Cyc. Corp. § 3916.

> The [estoppel] rule does not apply in the case of fraud, as where the recognition of a pretended corporation is itself brought about by false representations that it is incorporated.... [T]o render it inequitable to hold a person who has dealt with an association as a corporation estopped to set

up fraud in its organization, ... the fraud must affect that person.

*Id.* at § 3917; *see also, El Ranco, Inc. v. First Nat. Bank of Nevada,* 406 F.2d 1205 (9th Cir.1968), *cert. denied,* 396 U.S. 875, 90 S.Ct. 154, 24 L.Ed.2d 133 (1969) (citing *Casey v. Galli,* 94 U.S. 673, 4 Otto 673, 24 L.Ed. 168 (1876); *Union Mutual Life Ins. Co. v. Mowry,* 96 U.S. 544, 6 Otto 544, 24 L.Ed. 674 (1877); 19 Am.Jur. Estoppel § 39) (principles of estoppel operate to protect persons who would otherwise suffer loss or incur liability because of their reliance in good faith upon a false representation made by a person in charge of a business regarding the legal nature of the business entity organization with which the dealings are carried on).

> As in other cases of equitable estoppel, there must be ignorance of the truth and absence of equal means of knowledge of it by the party who claims the benefit of the estoppel. *Knowledge, on the part of the one claiming the estoppel, that there is no corporation, precludes an estoppel, without regard to whether the estoppel is relied upon by the corporation or by the party other than the alleged corporation.*

Fletcher Cyc. Corp. § 3905 [emphasis added]. *See generally, Phelps v. Friedman,* No. 96–558154, 1997 WL 85200 (Conn.Super.Ct. Feb. 10, 1997) (plaintiff could not deny corporation's existence where *both* parties believed they were dealing with corporation, and entity was, in fact, a de jure corporation); *Shawmut Bank Connecticut N.A. v. Ciccone,* No. 91–0120548, 1993 WL 445833 (Conn.Super.Ct. Oct. 13, 1993) (where *both* parties relied upon the corporations' assets and existence, it would be inequitable to impose personal liability on the individual defendants); *Card v. Moore,* 68 A.D. 327, 74 N.Y.S. 18 (2d Dep't 1902), *aff'd,* 173 N.Y. 598, 66 N.E. 1105 (1903) (no estoppel for party who *knows* the entity is not incorporated).

Here, plaintiffs seek recognition as a corporation by estoppel as a means of validating the contract with Marine and of maintaining this action. The parties have not cited, nor could this court find, any cases from Connecticut's highest court directly addressing this issue. Connecticut's Appellate and Superior courts have, however, recognized the

doctrine of corporation by estoppel. *See Clark–Franklin–Kingston Press, Inc.*, 529 A.2d at 244 (citing *West Winsted Savings Bank & Building Assn. v. Ford*, 27 Conn. 282 (1858) as support for doctrine's application in Connecticut); *see also, Phelps*, 1997 WL 85200; *Shawmut Bank Connecticut N.A.*, *1993 WL 445833*; *Shelton Center Assoc. v. Zalumous, d/b/a Power Trans.*, No. CV91–036450, 1992 WL 389922 (Conn.Super.Ct. Dec. 11, 1992).

While none of the above cases involved a claim of misrepresentation, it is clear upon reviewing those decisions that the Connecticut courts have consistently applied the well-established equitable principles set forth in the Fletcher treatise and its related cases, on which both parties rely. There is every reason to believe that these same principles would be applied to the present action, were plaintiffs' claims presented to the state's highest court. Consequently, this court will apply the principles set forth above in examining the arguments presented here.

■ Defendant relies on *Held v. Crosthwaite*, 260 F. 613 (2d Cir.1919) (applying New Jersey law), in support of its claim that plaintiffs cannot invoke the estoppel doctrine in this case. In *Held*, the Second Circuit acknowledged the general principal that one who deals with an entity as a corporation is estopped from later denying its corporate existence. But the court went on to find that "it is another matter when [estoppel] is invoked to relieve from liability persons who have wrongfully held themselves out as the agents of a nonexistent corporation." *Id.* at 628. The court held that it would be contrary to public policy to apply the doctrine in such a case, noting that estoppel operates in favor of persons who have been misled to their injury. *Id.*

Defendant Marine submits the following evidence in support of its claim that estoppel would be inequitable here. George MacKenna, Vice President of Marine, states in his affidavit that Marine requires each of its affinity groups to be incorporated, and that he personally discussed this requirement with Richard Ewing in telephone conversations (item 75, MacKenna, ¶¶ 6, 8 & Ex. R). Ewing admits that such a conversation took place on January 6, 1992 (Id. at Ex. N, pp. 1023–25). Ewing also admits that he agreed to incorporate ISDA (Id.).

Furthermore, MacKenna affirms that on and after January 27, 1992, Ewing represented to Marine in all correspondence, advertising and other material that ISDA had incorporated (Id., MacKenna, ¶ 16). Ewing admits that all correspondence with Marine after that date was on ISDA, Inc. letterhead (Id. at Ex. N., p. 532; Ex. T). Ewing represented ISDA to be a bona fide corporation with himself as president, and signed the agreement as president of ISDA, Inc. (Id., MacKenna, ¶¶ 11, 12; Ex. N., pp. 273, 281–82; Ex. S., ¶ 4.9). According to Ewing, the affinity card agreement with Marine "could have produced my career retirement. My objective was to get my name on that contract. I wanted to seal the deal" (Id. at Ex. N., p. 1032).

Plaintiffs do not dispute that Ewing represented ISDA as a corporation, knowing that it was not. Instead, they claim that Marine was eager to obtain credit card accounts by whatever means available, and that Ewing's representations as to ISDA's legal status were not material to Marine's decision to enter into a contract. Plaintiffs point to Ewing's deposition testimony in which he states that when he approached Marine about an affinity card arrangement in 1991, he explained that ISDA was then just a marketing concept (Item 78, Ex. V., pp. 171–78, 857–58, 880–81). Ewing subsequently received a letter from Marine, dated December 12, 1991, giving notification of Marine's approval of ISDA as an affiliate in its affinity credit card program (Id. at Ex. D). According to plaintiffs, Marine's interest in ISDA while it was still in the conceptual stage evidences defendant's willingness to contract with a non-corporate entity. I disagree.

Plaintiffs proffer evidence that predates the parties discussions as to ISDA's legal status and their contract negotiations. They have not come forward with any documents or affidavits to counter defendant's showing that defendant required that ISDA incorporate prior to entering into an agreement, that Ewing promised he would do so and thereafter represented ISDA as a corporation, and

that Ewing knew this representation was false. Furthermore, Ewing also admitted that he knew ISDA's legal incorporation was important to Marine (Item 75, Ex. N., p. 1021).

Accordingly, I find that plaintiffs have failed to demonstrate that ISDA's legal status was immaterial to Marine's decision to contract with that entity.

■ Plaintiffs attempt to negate their own misrepresentations by claiming that defendant should have demanded to see some proof of ISDA's incorporation prior to entering into the contract. Defendant objects to this argument based on Ewing's admission that Marine's reliance on his misrepresentations was reasonable (Item 75, Ex. N, p. 1029–30). Neither party cites any case law to support their position.

A similar argument was presented to the Eighth Circuit in *Harrill v. Davis,* 168 F. 187 (8th Cir.1909). In that case, the defendants had knowingly engaged in business as a non-existent corporation. The court held that the general rule did not apply under those circumstances, and that one who deals with parties masquerading under a name which represents no corporation is not estopped from denying that it is a corporation. *Id.* 168 F. at 195. The court went on to note that a party seeking the benefit of estoppel must be ignorant of the truth and lack equal means of knowledge. It found that the defendants, who misrepresented the company as a corporation, had better means of knowledge as to its legal status than the plaintiff, and held that they could not, therefore, claim estoppel. *Id.*

The present case is similar. Here, Richard Ewing admits that he represented ISDA as a corporation. He also admits he knew that it was not. As the individual who formed the entity ISDA, he surely had at least an equal means of knowledge as to the requirements for incorporation in Connecticut and ISDA's true status. Accordingly, he cannot claim that defendant is estopped from denying ISDA's corporate existence on this ground.

■ In the alternative, plaintiffs argue that the contract between the parties should be enforced because Marine derived financial benefit from the agreement. First, I note that by arguing for enforcement of the contract, plaintiffs are in effect attempting to bypass the threshold issue of plaintiffs' capacity to contract. In addition, the case law cited by plaintiffs does not support recognition of a corporation by estoppel here. For instance, while several of the cited cases acknowledge that estoppel can be based upon the acceptance and retention of benefits, they go on to hold that estoppel is appropriate where the party who benefitted had knowledge or notice of information which it later attempts to use to contest the transaction at issue. *See Puma Indus. Consulting, Inc. v. Daal Assoc., Inc.,* 808 F.2d 982, 986 (2d Cir.1987) (estoppel applied where plaintiff knew of defendant's actual legal status); *Savasta v. 470 Newport Assoc.,* 180 A.D.2d 624, 579 N.Y.S.2d 167, 169 (2d Dep't 1992), *aff'd,* 82 N.Y.2d 763, 603 N.Y.S.2d 821, 623 N.E.2d 1171 (1993) (waiver requires that party to be estopped be aware of certain facts and elect not to act on them); *National Bank & Trust Co. of Norwich v. Woods,* 128 Misc.2d 1051, 493 N.Y.S.2d 76, 77 (N.Y.Sup.Ct.1985).

Plaintiffs also rely on *Ross v. City of Berkeley,* 655 F.Supp. 820 (N.D.Cal.1987), in which property owners challenged the constitutionality of the city's eviction control legislation. I note first that the issue of corporate estoppel was not presented to the court, and that it was addressed tangentially in a footnote. *Id.* at 828–29, n. 9. The court stated, in dicta, that the plaintiffs in that case would *likely* be estopped from challenging the corporate existence of its tenant where it had contracted with the entity as a corporation and received benefits from that contract. *Id.* Upon review of the factual circumstances, I find that the *Ross* case comports with the holdings in the cases cited above.

Plaintiff Ross entered into a lease with two persons who signed the contract individually and also as "aka Espresso Roma, Inc." *Id.* at 826. Ross knew that the individuals planned to form a corporation, and in fact was offered stock in the enterprise. *Id.* One month after the lease was entered into, the corporation was legally formed and plaintiff Ross re-

ceived eight shares of stock. *Id.* Hence, plaintiff Ross was fully aware that Espresso Roma, Inc. was not formally incorporated at the time he entered into a lease with that entity. Furthermore, the entity became a de jure corporation shortly thereafter with plaintiff Ross himself as one of the shareholders. Equity would certainly dictate that Ross could not thereafter deny the corporation's existence.

The cases cited by plaintiffs are readily distinguished from the present action. Here, defendant affirms that it did not discover that ISDA was an unincorporated entity until after the present action was commenced (Item 75, MacKenna Aff., ¶ 15). Plaintiffs do not dispute this assertion, nor have they come forward with any evidence to demonstrate that defendant knew that ISDA was not a corporation, and that it elected to go forward under the contract in order to reap the benefits therefrom.

Accordingly, plaintiffs have failed to establish that estoppel is warranted here.

For all of the reasons stated, I find that ISDA is not a corporation by estoppel. The equitable principles set forth above do not favor preventing defendant from denying ISDA's corporate existence where ISDA was not a de jure or de facto corporation, where plaintiffs knowingly misrepresented its legal status, where Richard Ewing signed a contract as president of a corporation that he knew to be nonexistent, and where defendant was unaware that ISDA was not incorporated.

### 3. Effect of Determination as to Corporate Status.

Defendants maintain that because the agreement was executed by a party that did not exist there are not two parties to the contract, and there can be no contract as a matter of law.

■ Under Connecticut law, a nonexistent corporation does not have the legal capacity to make a contract. *Chieppo*, 90 A. at 941 (citations omitted) (refusing to apply this general principle upon finding that company was a de jure corporation when note at issue was executed).

■ Furthermore, it is well-settled under contract formation law in New York that there must be two parties to a contract. *Persky v. Bank of Am. Nat'l Ass'n*, 261 N.Y. 212, 219, 185 N.E. 77 (1933). Formation of a valid contract requires a meeting of the minds between determinate contracting parties. *Kelly Asphalt Block Co. v. Barber Asphalt Paving Co.*, 211 N.Y. 68, 71, 105 N.E. 88 (1914). If one of the parties is wanting, then one of the formal constituents of a legal transaction is absent. *Id.* (citing *Rodliff v. Dallinger*, 141 Mass. 1, 6, 4 N.E. 805 (1886) (there can be no transaction where a purported party is nonexistent)).

■ As already determined above, ISDA, Inc. is a nonexistent corporation. As such, it does not have the legal capacity to contract. Where there is only one determinate party, there is no agreement with any one. "There is nothing more than an offer lanced into the void." *Irvmor Corp. v. Rodewald*, 253 N.Y. 472, 171 N.E. 747 (1930).

■ Defendant also maintains that although the complaint was amended to add "Richard P. Ewing d/b/a International Sport Divers, Inc." as a plaintiff, Richard Ewing is not a party to the contract and therefore does not have the capacity to sue on it. In support, defendant relies on the contract itself, which designates Marine and ISDA, Inc. as the parties to the agreement, and on Ewing's own admission that no other person or entity has any rights under that agreement (Item 75, Ex. S & Ex. N, p. 291). Ewing signed the contract, not in his individual capacity, but in his alleged capacity as president the corporation, ISDA, Inc. (Id. at Ex. S, see Ex. N., pp. 1029–30).

Plaintiffs have not responded to this argument. Upon review, I find there is nothing in the record to indicate that Marine entered into an agreement with Richard Ewing in his individual capacity or as a member of an unincorporated association.

For the reasons set forth above, there were not two determinate parties to the contract, and the purported agreement between Marine and ISDA, Inc. is therefore invalid and unenforceable. Accordingly, it is recom-

mended that defendant's motion for summary judgment be granted as to plaintiffs' breach of contract claims. Furthermore, it is recommended that plaintiffs' motion for summary judgment be denied in its entirety.

## B. *Fraudulent Inducement.*

Marine maintains, in the alternative, that its contract with ISDA, Inc. is vitiated because defendant was fraudulently induced to enter into the agreement. I note at the outset that fraud only becomes important where the contract is complete in its formal elements. As already determined above, such is not the case here.

Were it necessary to consider this issue, however, defendant would not be entitled to summary judgment on this ground. The standard for assessing a claim of fraudulent inducement under New York law is more stringent than that for assessing a claim that knowing misrepresentation of an entity's legal status precludes a claim of estoppel. In order to demonstrate that it was fraudulently induced to enter into an otherwise valid agreement with ISDA, Inc., Marine must show that plaintiffs 1) made a misrepresentation or a material omission of fact which they knew was false, 2) which was made for the purpose of inducing Marine to rely on it, 3) justifiable reliance by Marine, and 4) injury. *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996); *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958); *Century 21 v. F.W. Woolworth Co.*, 181 A.D.2d 620, 582 N.Y.S.2d 101 (1st Dep't 1992).

Without discussing each of the factors in detail, it is evident that a question of fact exists as to whether defendant suffered any injury as a result of the alleged fraud. Actual damage and injury is an essential element of defendant's motion and counterclaim. The measure of damage is indemnity for the actual pecuniary loss sustained as the direct result of the wrong, or what is known as the "out-of-pocket" rule. *Hanlon v. Macfadden Publications*, 302 N.Y. 502, 99 N.E.2d 546 (1951); *Reno v. Bull*, 226 N.Y. 546, 553, 124 N.E. 144 (1919).

Here defendant relies on the affidavit of George MacKenna, which states that Marine incurred $9,078 in costs and expenses in connection with the ISDA affinity card (Item 75, MacKenna, ¶ 17).[2]

Plaintiffs, in turn, point to Marine's supplemental responses to their first set of interrogatories, in which defendant estimates that it received gross revenues of $107,946 from the ISDA affinity card program during the period September 1992 to September 1995 (Item 78, Ex. R, p. 3).

On the limited record presented, it does not appear that defendant suffered any actual pecuniary loss as a result of plaintiffs' alleged fraud. In the absence of more detailed information as to defendant's expenses and net revenue, there is clearly a question of fact in this regard. Accordingly, it is recommended that defendant's request for summary judgment based upon fraudulent inducement to contract be denied.

## IV. CLAIM UNDER N.Y.GEN.BUS.LAW § 349

In their second cause of action, plaintiffs claim that by failing to perform its obligations under the affinity credit card program agreement, defendant violated New York General Business Law § 349. Plaintiffs assert that defendant's breach of contract constitutes deceptive business practices as defined under that statute.

Given the above findings that there is no valid and enforceable contract and consequently, there can be no breach, any additional claims based upon that breach must also be dismissed.

Defendant argues, as an alternative ground for dismissal, that plaintiffs fail to state a claim under this statute even if a valid contract is found to exist. Specifically, defendant maintains that § 349 does not apply to private contract disputes and also that

---

**2.** Defendant also points to paragraphs 19–22 of the MacKenna affidavit. That portion of the affidavit does not, however, provide any information regarding expenses or income related to the ISDA affinity card program.

plaintiffs have not alleged a required element of their claim—that is, public injury resulting from defendant's conduct. I agree.

Section 349 states, in pertinent part, that: (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

N.Y.Gen.Bus.Law § 349 (McKinney 1997).

This statute has been construed by the courts as a consumer protection law that is inapplicable to "business-versus-business disputes ... where the party asserting the claim is not acting in a consumer role." Richard A. Givens, Supplementary Practice Commentary, N.Y.Gen.Bus.Law §§ 349–350, at 129 (McKinney Supp.1994), *quoted in Logan & Kanawha Coal Company, Inc. v. Banque Francaise du Commerce Exterieur,* 868 F.Supp. 63, 68 (S.D.N.Y.1994). The leading opinion discussing the scope of this section is *Genesco Entertainment v. Koch,* 593 F.Supp. 743 (S.D.N.Y.1984), in which Judge Weinfeld wrote:

The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising. The consumer oriented nature of the statute is evidenced by the remedies it provides.... The New York cases where plaintiffs have recovered under section 349(h) further reflect its consumer orientation since they uniformly involve transactions where the amount in controversy is small. That the deceptive practices this statute seeks to combat involve recurring transactions of a consumer type is further supported by the origin of the statute. Section 349(h) is substantially modelled on the Federal Trade Commission Act [15 U.S.C. § 45].

*Genesco Entertainment,* 593 F.Supp. at 751–52 (citations omitted).

 As these cases instruct, in order to plead and prove a claim for relief under this statute, the plaintiff "must, at the threshold, charge conduct that is consumer oriented." *New York University v. Continental Insurance Co.,* 87 N.Y.2d 308, 320, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). The conduct need not be repetitive or recurring, but the defendant's acts or practices must have a broad impact on consumers at large. "Private contract disputes unique to the parties ... would not fall within the ambit of the statute." *Oswego Laborers' Local 214,* 85 N.Y.2d at 25, 623 N.Y.S.2d 529, 647 N.E.2d 741. The plaintiff must therefore plead and prove injury to the public generally, not just to himself. *Oboler v. Insurance Co. of North America,* No. 91–2808, 1994 WL 414438, at *3 (S.D.N.Y. August 5, 1994); *see also, Grand General Store, Inc. v. Royal Indem. Co.,* No. 93–3741, 1994 WL 163973, at *3 (S.D.N.Y. April 15, 1994) (conclusory allegations of the existence of an insurance claim settlement policy designed to deceive the public at large insufficient to state claim under § 349); *Tinlee Enterprises, Inc. v. Aetna Casualty & Surety Co.,* 834 F.Supp. 605, 608–09 (E.D.N.Y.1993) (allegations of unfair insurance claims settlement practices insufficient to state claim under § 349); *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, (S.D.N.Y.1988) (complaint alleging injury to class of independent insurance brokers who lost their commissions, rather than to consumers or the public interest, did not state a cognizable claim under § 1983); *cf. Riordan v. Nationwide Mut. Fire Ins. Co.,* 977 F.2d 47, 53 (2d Cir.1992) (specific allegations of insurance claim settle-

ment policy designed to deceive public at large stated claim under § 349).

In this case, the proposed claim alleges as follows:

[Defendant's breach of contract] constitutes a violation of New York General Business Law § 349 on the part of the defendant in that said actions and practices by the defendant constitute deceptive acts and practices in the conduct of business, trade and commerce in the furnishing of services in New York State.

(Item 51, ¶ 14). This allegation is insufficient to state a claim for relief under § 349. The general language, premised on a breach of contract between private parties, does not allege any injury to consumers or to the public interest.

In addition, it is clear that the contract at issue involves complex financial arrangements. knowledgeable parties and potentially, large sums of money. *Genesco Entertainment*, 593 F.Supp. at 752. Defendant's alleged business practices are clearly "different in kind and degree from those that confront the average consumer who requires the protection of a statute against fraudulent practices." *Id.*

Finally, plaintiffs allege that defendant's deceptive business practices caused them damages "in an amount not yet known but believed to be in excess of $1,000,000.00" (Item 51, ¶ 15). On the face of the statute, recovery under § 349 is limited to a maximum of $1,000 dollars for a willful violation.

For the reasons set forth, defendant's motion for summary judgment should be granted as to plaintiffs' second cause of action.

## V. CLAIM UNDER CONN.GEN.STAT. § 42–110a to 42–110q.

Plaintiffs third cause of action alleges that:

17. Some or all of the representations by the defendant, as set forth in paragraph 8 hereof [regarding defendant's obligation to conduct a test mailing of credit card solicitations], were untrue when made and were negligently, recklessly or intentionally made by the defendant.

18. The defendant failed to act and perform in accordance with those representations set forth in paragraph 8 hereof.

19. The foregoing constitutes a violation of the Connecticut Unfair Trade Practices Act, C.G.S. § 42–110a et. seq. [stet] on the part of the defendant in that said actions by the defendant were a violation against public policy concerns involving principles of fairness and/or were unethical, deceptive, oppressive and unscrupulous; and caused substantial injury to the plaintiffs . . . .

(Item 51, ¶¶ 8, 17–19).

 Again, plaintiffs' claim arises from defendant's alleged breach of its obligations under an agreement between Marine and ISDA, Inc. As determined above, where it is found that no valid and enforceable contract exists, any claim related to the breach of the purported agreement must also fail. Furthermore, were a valid contract found to exist here, any claims arising from a breach thereof would be governed by New York law under the agreement's forum selection clause.

For these reasons alone, plaintiffs' third cause of action should be dismissed.

 In addition, defendant notes that there are similarities between Connecticut's Unfair Trade Practices Act (CUTPA) and New York's Gen.Bus.Law § 349. Defendant maintains that as with the New York statute, breach of contract claims do not fall within CUTPA in any event. While there is no need to address this argument, I do note my agreement.

In *Boulevard Assoc. v. Sovereign Hotels, Inc.*, 72 F.3d 1029 (2d Cir.1995), the Second Circuit confirmed its agreement with the vast majority of courts in Connecticut when it stated that:

[A] simple contract breach is not sufficient to establish a violation CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy.

*Id.* at 1038–39 (citations omitted). Plaintiffs' allegations fall squarely within this holding.

Accordingly, it is recommended that defendant's motion be granted as to plaintiffs' third cause of action alleging a violation of the Connecticut Unfair Trade Practices Act.

## VI. DEFENDANT'S SIXTH COUNTER-CLAIM.

In its sixth counterclaim, Marine alleges that Richard P. Ewing entered into a Visa credit card agreement with Marine, and that plaintiff has defaulted under that agreement by exceeding his credit limit without authorization and by failing to make payments (Item 58, ¶¶ 48–59). According to defendant, Richard Ewing owes Marine $17,278.57 plus interest and fees (Id. at ¶ 54).

In support, defendant submits a copy of the credit card agreement as well as monthly statements and an account report (Item 75, Exs. AAA & BBB). In addition, Ewing admitted during his deposition that he owes Marine a balance on his Visa account (Id. at Ex. N., pp. 783–805).

Plaintiffs did not provide any response with respect to this counterclaim. When asked about the claim at oral argument, plaintiff stated that he had no defense. He also did not dispute defendant's account of the amount owing.

Accordingly, it is recommended that defendant's motion for summary judgment on its sixth counterclaim be granted.

### *CONCLUSION*

For the reasons set forth above, it is recommended that defendant's motion for summary judgment dismissing the complaint (**Item 75**) be granted, and that plaintiffs' cross-motion for summary judgment (**Item 78**) be denied. As to defendant's counterclaims, it is recommended that defendant's motion for summary judgment on its sixth counterclaim (Item 75) be granted.

May 27, 1998.